[Crim. No. 20888. Feb. 11, 1981.]

THE PEOPLE, Plaintiff and Respondent, v.
ROBERT ALTON HARRIS, Defendant and Appellant.

936

938

942

COUNSEL

Michael J. McCabe, under appointment by the Supreme Court, and Savitz & McCabe for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Daniel J. Kremer, Assistant Attorney General, Harley D. Mayfield, Alan S. Meth, Karl Phaler and Michael D. Wellington, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**CLARK, J.**—Defendant Robert Alton Harris appeals from a judgment imposing the death penalty following his conviction of kidnaping, robbery and first degree murder of John Mayeski and Michael Baker. (Pen. Code, §§ 187, 189, 190, 209, subd. (b), 211.)[1] Defendant was also convicted of receiving stolen property (§ 496, subd. 1) and of possession of a concealable firearm by an ex-felon (§ 12021). The latter offense and the allegation that he had served a prior separate prison term for manslaughter, a "violent felony" within the meaning of section 667.5, subdivision (c), were admitted by defendant outside the presence of the jury. With regard to each of the kidnaping, robbery and murder counts, the jury found defendant was armed with a firearm (§ 12022), personally used a firearm (§§ 1203.06, 12022.5) and personally inflicted great bodily injury upon his victims (§ 12022.7). That defendant was convicted in this proceeding of more than one first degree murder was one of the special circumstances found by the jury. (§ 190.2, subd. (c)(5).) The other special circumstances were that each of the murders was wilful, deliberate, premeditated and committed during the commission of kidnaping and robbery. (§ 190.2, subd. (c)(3)(i)-(iii).) We affirm the judgment.

### GUILT PHASE

In May or June of 1978 defendant first asked his brother Daniel for help in a planned bank robbery.[2] Defendant next raised the subject in July of 1978 while visiting Daniel in Visalia. On 2 July 1978, Daniel stole a .22 rifle and a .9 millimeter pistol from the home of Jim Corbin, a neighbor. While Daniel and defendant were in the house, apparently in Corbin's absence, defendant stated they needed weapons for the bank robbery and asked whether there were any in the house. Daniel then showed defendant the guns and took them from the house.

The brothers left Visalia for San Diego that evening. The next morning, 3 July 1978, they purchased ammunition, went to a nearby rural area and practiced firing the weapons by shooting at trees while running and rolling—a drill they considered appropriate in preparing for the bank robbery. The brothers then drove to the Mira Mesa area of

---

[1]Statutory references are to sections of the Penal Code unless otherwise noted.

[2]Daniel testified for the People in return for being permitted to plead guilty to one count of kidnaping. His testimony was corroborated by a series of extrajudicial statements made by defendant.

San Diego County and spent the night in a house defendant had been sharing with his girl friend.

The following morning, 4 July 1978, defendant and his brother purchased more ammunition as well as knit caps, in which they burned eye holes, to serve as masks in the bank robbery. That afternoon they went to the Miramar Lake area, near Mira Mesa, for more shooting practice. They walked up a fire trail, fired a few rounds, but left when a vehicle approached. They next reconnoitered the area around their intended target—the San Diego Trust and Savings Bank on Mira Mesa Boulevard.

The next morning, 5 July 1978, having decided to steal an automobile for use as a getaway car, the brothers spotted a green Ford in a grocery store parking lot directly across Mira Mesa Boulevard from the bank. John Mayeski, 15, and Michael Baker, 16, were in the car eating hamburgers. Assuring Daniel "nobody is going to get hurt," defendant walked over to the Ford, pulled the pistol from his waistband, and got in the back seat. With Daniel following in defendant's car, the Ford was then driven out Mira Mesa Boulevard toward Miramar Lake and the fire trail where the brothers had been the day before.

At the foot of the fire trail defendant and Daniel parked the cars and forced the two boys to walk up the trail at gunpoint. Defendant was carrying the pistol and Daniel the rifle. Defendant told the boys their car was going to be used in a bank robbery but that no one would be hurt. Defendant asked the boys whether there was any rope in their car. The boys replied there was not but said they would walk to the top of the hill, wait until the brothers drove back to Mira Mesa, and then report the Ford as stolen, giving the police a misleading description of the thieves. Defendant voiced approval of this suggestion.

The boys then began walking up the hill. Suddenly, Daniel heard a shot. Turning around, he saw John Mayeski fall to the ground. Defendant had shot the boy in the back with the pistol. Defendant fired another shot into the boy's head, then ran after Michael Baker. Finding the Baker boy crouching and screaming in the brush, defendant shot him four times. Defendant then went back to the fallen Mayeski boy and fired a shot point-blank into his head. Finally, defendant picked up the rifle dropped by Daniel and shot John Mayeski yet again. The brothers then left the murder scene and drove back to the house defen-

dant shared in Mira Mesa. There defendant ate the remainder of the dead boys' food and laughed at Daniel for not having the stomach to join him.

While the brothers continued preparing for the bank robbery, defendant laughed and giggled about shooting the boys, saying he had blown Michael Baker's arm off. Defendant also amused himself by imagining what it would be like to be a police officer and to report the boys' deaths to their families. When Daniel noted there were fragments of flesh on defendant's pistol, apparently from the point-blank shot fired into John Mayeski's head, defendant laughed, commented he had really blown the boy's brains out, and then flicked the bits of flesh into the street.

Later the same day the brothers robbed the bank.[3] They were quickly arrested for the bank robbery when a witness, who followed them from the bank to defendant's house, called the police.

The brothers were arrested at 1:05 p.m. on 5 July 1978. At 4 p.m., Daniel first informed officers of the murders; at 6:30 p.m., Daniel confessed in a tape-recorded statement, placing the blame primarily on defendant. At 7 p.m., having listened to portions of Daniel's statement, defendant himself confessed to Officer Fred Dreis. At midnight, the brothers were interviewed by Dr. Wait Griswold, a psychiatrist. On 7 July 1978, at 11:20 a.m., defendant repeated his confession in detail to Johnny Bolden, a criminal investigator for the San Diego County District Attorney's office. Finally, at 1 p.m. on 7 July 1978—an hour before he was arraigned—defendant confessed to Officer Ronald Newman.[4]

When one of defendant's sisters visited him in jail on 15 July 1978, he told her, "Now, I guess because I killed those two boys, they were only 16 years old, then robbed the bank and kidnaped them was because I really wanted to die." Defendant's last extrajudicial confession was made to a fellow inmate. Asked why he had killed the boys, defendant answered, "I couldn't have no punks running around that could do that [identify him], so I wasted them."

---

[3]They were convicted of this crime in a federal proceeding.

[4]The details of defendant's confessions will be given when we discuss his contention that the last of the four confessions, the one to Officer Newman, should have been suppressed on the ground his arraignment was unnecessarily delayed.

Testifying in his own behalf at the guilt phase, defendant admitted the bank robbery but denied kidnaping, robbing and murdering the two boys. He explained his pretrial confessions as attempts to protect his brother.

PENALTY PHASE

In 1975 defendant pleaded guilty to voluntary manslaughter of James Wheeler.

Wheeler and his wife lived with defendant's brother Ken and his wife; defendant and his wife lived next door. At the scene, defendant admitted beating Wheeler to death but claimed he had done so to protect the victim's wife when her husband threatened her with a knife. Later, just as in the present case, defendant repudiated his confession and sought to shift the blame to his brother, claiming Ken had killed Wheeler and that he had confessed to protect Ken. This is the story defendant told when testifying in the present proceeding. However, defendant's former wife and his niece testified defendant, without provocation, beat Wheeler to death while mockingly claiming to teach his victim self defense. During this sadistic attack defendant also cut off Wheeler's hair and threw matches at him after squirting him with lighter fluid. Defendant's former wife admitted she lied to the grand jury investigating Wheeler's death explaining defendant had threatened to kill her too if she did not support his story.

Defendant continued to lead a life of violence while in jail awaiting trial on the present charges.

Defendant was housed in a "tank" consisting of a dayroom and adjoining cells. A guard approaching the tank overheard a conversation between defendant and other inmates in which reference was made to a knife. When the guard left to advise his superior a search should be conducted, one of the inmates, realizing a search was likely, told defendant to hide the "shank."[5] Defendant went to his cell, removed from a box a piece of metal, which was approximately 10 inches long and sharpened on 1 edge. He then returned to the dayroom and concealed the shank underneath a table top where guards found it minutes later.

---

[5]A "shank" is a knifelike implement fashioned by a prisoner from available materials.

The next day defendant presided over a kangaroo court and found another inmate, Keith G., guilty of cowardice. Defendant told Keith he would have to submit to sodomy or lose his life. Keith was then taken into a cell, forced to lie face down on the bunk with his trousers pulled down and forcibly subjected to sodomy by three inmates, including defendant. Later in the day his assailants demanded Keith play strip poker with them. When Keith would not pick up his cards he was taken into the shower room and forced to orally copulate defendant and another inmate. Removed from the tank when he reported the assaults, Keith later encountered defendant in a holding area. Despite the presence of guards, defendant loudly and repeatedly threatened Keith's life.

Six days after the assaults upon Keith were reported, defendant's cell was searched. In the toilet a large water-soaked wad of tissue was found. Wrapped in the tissue was a 17-inch wire with looped ends in which the short pencils available to inmates might be inserted as handles. The guard who found this garrote said, "Look what I found, Bobby." Defendant, laughing, replied, "Aw, looks like you have me now."

Defendant's testimony during the penalty phase indicated he had a dismal childhood. When defendant was approximately 11 years old, his father served two separate prison terms for having sexual relations with defendant's sisters. The family then followed the harvest from state to state with defendant's mother and her boyfriend. Defendant's schooling ended in the seventh grade. Defendant's mother forced him to leave the family when he was 14, saying he was not working hard enough. He soon stole a car and served four years in federal institutions for that crime, escape and a separate instance of attempted escape. He was subsequently imprisoned for the voluntary manslaughter of James Wheeler. Defendant was 26 years old at the time of trial.

Defendant admitted his testimony at the guilt phase—that he had nothing to do with killing the boys—was a lie. Changing his story, defendant testified he had not planned to kill the boys, that his brother had fired first, and "the next thing I knew I was shooting them myself."

Defendant claimed he was "sorry" about the murders. In support of this claim, defendant called Deputy Sheriff Michael Mendoza who testified that when he inquired into defendant's emotional state after he cut his wrist and reportedly attempted to stab himself with a pencil,

defendant appeared remorseful. However, defendant admitted on cross-examination he had told a jail visitor his attorney wanted him to express remorse and he was not going to do so.

## DISCUSSION

None of the many contentions raised by defendant has merit. Indeed, none comes close to demonstrating prejudicial error. Nevertheless, because defendant's life is at stake, each will be fully discussed.

## I

Defendant contends the trial court erred in denying his motion for change of venue based on prejudicial pretrial publicity.

■ A change of venue must be granted when the defendant shows a reasonable likelihood that in the absence of such relief, a fair trial cannot be had. (*People* v. *Welch* (1972) 8 Cal.3d 106, 113 [104 Cal.Rptr. 217, 501 P.2d 225]; *Frazier* v. *Superior Court* (1971) 5 Cal.3d 287, 294 [95 Cal.Rptr. 798, 486 P.2d 694]; *Maine* v. *Superior Court* (1968) 68 Cal.2d 375, 383 [66 Cal.Rptr. 724, 438 P.2d 372].) ■ Whether raised on petition for writ of mandate or on appeal from judgment of conviction, the reviewing court must independently examine the record and determine de novo whether a fair trial is or was obtainable. (*People* v. *Welch, supra; People* v. *Tidwell* (1970) 3 Cal.3d 62, 68-69 [89 Cal.Rptr. 44, 473 P.2d 748]; *Maine* v. *Superior Court, supra,* 68 Cal.2d at p. 382.) ■ The factors to be considered are the nature and gravity of the offense, the nature and extent of the news coverage, the size of the community, the status of the defendant in the community, and the popularity and prominence of the victim. (*People* v. *Salas* (1972) 7 Cal.3d 812, 818 [103 Cal.Rptr. 431, 500 P.2d 7, 58 A.L.R.3d 832].)

■ Of these factors, two weighed in favor of a change of venue in this case. Murder is, of course, a crime of the utmost gravity, and these murders were especially heinous. Press coverage of the crimes was extensive and included such information as that defendant was on parole for manslaughter, that his brother had confessed and had placed the blame principally on defendant, and that defendant himself had confessed. Two factors were neutral. Although the murdered boys were popular among their friends and their families were respected in their

neighborhood, there is no indication the victims or their families were "prominent." (Cf. *Maine* v. *Superior Court, supra,* 68 Cal.2d at p. 388; *Frazier* v. *Superior Court, supra,* 5 Cal.3d at p. 293.) Defendant lived in the same community as his victims and worked in San Diego. The final factor—the size of the community—tipped the balance against venue change.

The community in which this case was tried is quite unlike the communities involved in the cases upon which defendant relies. Of the fifty-eight California counties, San Diego County is third in population and ninth in area. Moreover, the City of San Diego, where the trial took place, is the second largest city in this state. (State of Cal. Statistical Abstract (1979) pp. 1, 9, 12-15.) This is significant because the "adversities of publicity are considerably offset if trial is conducted in a populous metropolitan area." (*People* v. *Manson* (1976) 61 Cal.App.3d 102, 189 [132 Cal.Rptr. 265], and cases cited therein.) That the populous metropolitan character of the community dissipated the impact of pretrial publicity in this case was made clear on voir dire.

█ "A significant difference between pretrial and posttrial review is that after conviction in determining whether a defendant received a fair and impartial trial under the 'reasonable likelihood' standard, the review is *retrospective.* It extends to an examination of what actually occurred at trial." (*People* v. *Martinez* (1978) 82 Cal.App.3d 1, 13 [147 Cal.Rptr. 208].) In other words, voir dire may demonstrate that pretrial publicity had no prejudicial effect. (See *Murphy* v. *Florida* (1975) 421 U.S. 794, 800-802 [44 L.Ed.2d 589, 594-596, 95 S.Ct. 2031]; *People* v. *Sommerhalder* (1973) 9 Cal.3d 290, 303-304 [107 Cal.Rptr. 289, 508 P.2d 289]; *People* v. *Manson, supra,* 61 Cal.App.3d at pp. 187-188; *People* v. *Whalen* (1973) 33 Cal.App.3d 710, 716 [109 Cal.Rptr. 282].)

█ Before discussing the voir dire in this case, it should be emphasized that the controlling cases "cannot be made to stand for the proposition that juror exposure to information about a state defendant's prior convictions or to news accounts of the crime with which he is charged alone presumptively deprives the defendant of due process." (*Murphy* v. *Florida, supra,* 421 U.S. at p. 799 [44 L.Ed.2d at p. 594].) "It is not required . . . that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to

arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion of the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." (*Irvin* v. *Dowd* (1961) 366 U.S. 717, 722-723 [6 L.Ed.2d 751, 755-756, 81 S.Ct. 1639].)

■ Examined under these guidelines, the voir dire clearly indicated pretrial publicity did not have the effect of denying defendant his right to a fair and impartial jury. Four of the jurors chosen had not been exposed to any pretrial publicity. Of the remainder, none remembered anything in the least damaging to defendant, none knew anything about his background, and none had formed an opinion concerning his guilt or innocence.

## II

We now consider defendant's contention that the trial court erred in denying his mistrial motions. The two motions arose out of separate but related incidents. The first incident involved a transcript given to the jury to assist them in understanding a tape recording of one of defendant's extrajudicial statements. Defendant moved for a mistrial on the ground the transcript contained a reference to his having called his parole officer. The second mistrial motion was based on the prosecutor's having elicited from defendant during cross-examination the admission he had been convicted of a felony and was on parole. Neither motion proves to have had merit.

### A

■ As stated, because of acoustical problems members of the jury were furnished transcripts of defendant's extrajudicial statement to Officer Dreis. References to defendant's manslaughter conviction were excised from the transcripts and the corresponding portions of the tape recording were not played for the jury. Well before trial, defense counsel was given a copy of the edited transcript. After reviewing it, counsel stated he had no objection. Despite these precautions, as the tape was

being played for the jury, the prosecutor noticed in the transcript the reference to defendant's having called his parole officer. Commendably, the prosecutor immediately brought the problem to the court's attention. As a result the tape was stopped before the passage in question was played, the jury was asked to stop reading the transcripts, and a recess was ordered. During the recess the transcripts were left on the jurors' chairs and collected by the bailiff. Denying the mistrial motion with the observation he did not believe the jurors had read as far as the troublesome reference, the court offered to inquire whether the jurors had read that passage. This offer was declined by defendant, but with his approval the jury was carefully instructed they were to disregard anything they may have read in the transcripts if the corresponding portion of the tape recording had not been played for them.

First, defendant should not be permitted to raise this issue, having reviewed and approved the transcript. Second, as the trial court pointed out, there is no reason to believe the jury read the statement in question. Third, if they did read the statement, we must assume they obeyed the instruction to disregard it. Finally, as will be explained below, inquiry by defense counsel following the guilt phase revealed the jury did not consider defendant's prior conviction during its deliberations.

### B

■ Defendant's admission during cross-examination that he had previously been convicted of a felony and was on parole occurred under the following circumstances. Shortly after defendant was arrested, an evidence technician took nitric acid swabs of his hands to check for gunpowder residue. As the technician did so, defendant asked him whether the swabs would detect powder burns and pick up gunpowder particles. Upon being informed the test would reveal whether he had fired a gun recently, defendant stated he had been shooting in the Porterville area approximately 24 hours earlier. Defendant contradicted this statement at trial when he testified he had been in the San Diego area the day before the murders and had fired a gun near Miramar Lake. Defendant further testified he had not known of the murders, or of any shootings, when the nitric acid swabs were taken, but was simply curious as to the purpose of the test.

The prosecutor pursued this line of inquiry further to demonstrate that in his conversation with the technician defendant manifested a con-

sciousness of guilt—that defendant was concerned about the test because he knew he had gunpowder on his hands as a result of shooting the boys and that defendant lied to the technician about his activities the previous day to provide an alternative, innocent explanation for the powder traces. Defendant clearly realized he was being backed into a corner; rather than admit the truth, he blurted out that he was an ex-felon and on parole.[6] This admission was obviously intended to provide a less damning explanation for defendant's concern that the swabbing would reveal that he had recently fired a gun, namely, that as a condition of his parole he was not to be in possession of a firearm.

Following defendant's admission there was a conference at the bench in which the prosecutor expressed surprise at defendant's answer and stated he would pursue the matter no further. Defendant's mistrial motion was denied on the ground that the prosecutor's questions were not intended to elicit the admission but that it had been volunteered by defendant. The jury was instructed that defendant's reference to being on parole for "some prior conduct" was not to be considered by them in de-

---

[6]"Q. Well, why would you be concerned about gunpowder being on your hand at that time, then?
"A. Just curious.
"Q. You didn't know there had been a killing of two boys up to that time, did you?
"A. No.
"Q. Didn't know anything about a gun prior to that, did you?
"A. No.
"Q. But you asked Mr. Stewart if this swabbing would take gunpowder off your hand, didn't you?
"A. Yes.
".   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .
"Q. Weren't you concerned that he would find evidence of your firing a gun that day when you killed the two boys?
"A. No.
"Q. It didn't bother you at all?
"A. Bother me? No, not then, no.
"Q. You weren't worried about there being evidence on your hands of firing a gun; right?
"A. Yes and no.
"Q. You were worried about it?
"A. Yes.
"Q. Why were you worried about it if there hadn't been any shooting?
"A. I'm not supposed to be around firearms or a pistol or even shoot a pistol.
"Q. Why aren't you supposed to be around a pistol?
"[Defense counsel:] Your Honor, I will object to the question.
"THE COURT: Overruled.
"[Defendant]: I was convicted of a felony.
"[Prosecutor]: And you were on parole?
"A. Yes.
"Q. So that is what you were worried about, is that what you are telling me now?
"A. Yes."

termining his innocence or guilt of the crimes charged in this proceeding.

"Where a defendant takes the stand and makes a general denial of the crime the permissible scope of cross-examination is very wide." (*People* v. *Ing* (1967) 65 Cal.2d 603, 611 [55 Cal.Rptr. 902, 422 P.2d 590], and cases cited therein.) When a defendant voluntarily testifies in his own defense the People may "fully amplify his testimony by inquiring into the facts and circumstances surrounding his assertions, or by introducing evidence through cross-examination which explains or refutes his statements or the inferences which may necessarily be drawn from them." (*People* v. *Schader* (1969) 71 Cal.2d 761, 770 [80 Cal.Rptr. 1, 457 P.2d 841].) Evidence relevant for these purposes is admissible even though it incidentally involves an unrelated offense. (*People* v. *Crawford* (1968) 259 Cal.App.2d 874, 880 [66 Cal.Rptr. 527].)

Under these principles the prosecutor's cross-examination of defendant was entirely proper. Moreover, any error in this regard was cured by the instruction that the jury was not to consider defendant's admission in determining whether he committed the present offenses. That the jury followed this instruction was established by inquiry defense counsel was permitted to make of the jury following the guilt phase. At the hearing on defendant's motion for new trial, defense counsel was asked by the court whether his inquiry of the jurors had shed any light on the issue. Counsel responded that none of the jurors he had interviewed was aware of defendant's prior conviction or had discussed the subject during deliberations.[7]

## III

Defendant contends the trial court erred in denying his motion to suppress his confession to Officer Newman. Defendant had argued in support of the motion that his arraignment was unnecessarily delayed and that the challenged confession was obtained during the period of illegal detention. We need not resolve the question whether defendant was promptly arraigned. Even assuming arguendo he was not promptly arraigned, the delay would not necessarily have rendered his confession to Officer Newman inadmissible. "[D]elay in arraignment is but one factor to be considered in determining whether a confession is vol-

[7]The contention raised in a supplemental brief—that trial counsel violated his obligations to defendant by telling the court what the jurors told him—is as offensive as it is absurd.

untary." (*In re Walker* (1974) 10·Cal.3d 764, 778-779 [112 Cal.Rptr. 177, 518 P.2d 1129]; see *People* v. *Kendrick* (1961) 56 Cal.2d 71, 85 [14 Cal.Rptr. 13, 363 P.2d 13]; *Rogers* v. *Superior Court* (1955) 46 Cal.2d 3, 10-11 [291 P.2d 929].) It is not contended, nor could it be, that defendant's confession to Officer Newman was involuntary.

Defendant was arraigned on the present charges 48 hours and 55 minutes after he was arrested for the bank robbery. The challenged confession was the last of four made by defendant during this period and occurred approximately an hour before he was arraigned. The parties stipulated to the following chronology. Defendant and his brother Daniel were arrested for the bank robbery and taken to the police station for interrogation concerning that crime at 1:05 p.m. on 5 July 1978. At 4 p.m., Daniel first informed the officers of the murders; 10 minutes later the victims' bodies were found at the location described by Daniel. At 6:30 p.m., Daniel confessed in a tape-recorded statement, placing the blame primarily on defendant.  .

At 7 p.m., having listened to portions of Daniel's statement, defendant confessed to Officer Dreis. (It is not contended with regard to any of these confessions that defendant's rights under *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974], were violated.) Defendant told Officer Dreis: "Danny thought I was going to let them go. He didn't know I was going to kill them. Danny was about 20 feet away sitting down when I shot them. I shot one and he spun around. I then shot him in the head because I didn't want him to suffer. I chased the other and shot the other boy about three times. Danny was scared and he didn't shoot either of them. I think I took the .22 and shot the blond kid one time. I was pretty loaded and didn't know what I was doing. I had smoked two joints before this came down. My brother was terrified. I didn't know what I was doing."

At midnight defendant and his brother were transported to the office of Dr. Wait Griswold, a psychiatrist, and interviewed by him concerning the murders. Defendant told Dr. Griswold he had shot the victims after assuring his brother they would not be hurt.

Defendant and his brother were booked into jail in the early morning hours of 6 July 1978. On 7 July 1978, at 11:20 a.m., defendant repeated his confession in detail to Investigator Bolden. He told Bolden,

among other things, that he and his brother planned to steal an automobile for use as a getaway car in the bank robbery; that he had approached the victims' car, pulled his pistol out of his waistband, entered the back seat of the car and ordered the boys to drive away; and that he shot John Mayeski in the chest and head with the pistol, then chased Michael Baker and upon catching him, shot the boy three or four times with the pistol, and, finally, went back to Mayeski and shot him with the rifle.

The challenged confession was given to Officer Newman at 1 p.m. on 7 July 1978—an hour before defendant was arraigned. Defendant contends this confession was crucial to the People's case, despite its being the last of the four confessions. He argues its detailed character was used by the People to impeach defendant's testimony at trial that he had no part in kidnaping, robbing and murdering the two boys; that his brother was solely responsible for the crimes; that his confessions were attempts to cover up for his brother, and that he learned the details of the crimes from his brother while they were detained at the police station. Be that as it may, it is clear the delay in his arraignment did not affect the voluntariness of defendant's confession to Officer Newman. There is no reason to believe that confession was less voluntary than his previous confessions, the first of which was given 42 hours earlier, just 6 hours after his arrest.

### IV

Defendant contends he was deprived of his constitutional and statutory right to be present personally at all trial proceedings. (See Cal. Const., art. I, § 15; Pen. Code, §§ 977, 1043.) As the People's case-in-chief drew to a conclusion, a hearing was held in the absence of the jury as to the admissibility of the People's exhibits theretofore marked for identification. There was also a brief review of the question whether the jurors should have been polled by the court as to whether they had read defendant's reference to his parole status in the transcript of his interview with Officer Dreis. The record clearly indicates defendant was not present at this hearing; it also reveals, with equal clarity, his counsel did not object to his absence. Given the nature of the matters under discussion, defendant's presence was not necessary to protect his interests. Accordingly, the court did not err in holding the hearing in defendant's absence. (See *People v. Jackson* (1980) 28 Cal.3d 264, 309-311 [168 Cal.Rptr. 603, 618 P.2d 149].)

## V

Defendant contends the trial court erred in instructing the jury by failing to properly limit the purposes for which other-crimes evidence might be considered.

Tailoring CALJIC No. 2.50 (1977 revision) to the facts of this case, the court instructed the jury: "Evidence has been received tending to show that the defendant committed a crime other than that for which he is on trial. Such evidence was not received and may not be considered by you to prove that he is a person of bad character or that he has a disposition to commit crimes. Such evidence was received and may be considered by you only for the limited purpose of determining if it tends to show one or more of the following: The identity of the person who committed the crime, if any, of which the defendant is accused; a motive for the commission of the crime charged; the existence of the intent which is a necessary element of the crime charged; that the defendant had knowledge of the nature of things found in his possession; that the defendant had knowledge or possessed the means that might have been useful or necessary for the commission of the crime charged. For the limited purpose for which you may consider such evidence, you must weigh it in the same manner as you do all other evidence in the case. You are not permitted to consider such evidence for any other purposes."

Defendant expressly concedes the instruction was correct insofar as it related to *motive*; that is, defendant concedes the evidence he subsequently robbed the bank using the murder victims' automobile as a getaway car was admissible as tending to show his motive in committing the murders. However, defendant contends the instruction was erroneous insofar as it permitted evidence of the uncharged crime to be considered for the other purposes mentioned.

■ Before discussing those other purposes, we note there is no merit in the People's argument that defendant is precluded from raising this issue by his failure to object to the instruction below. Section 1259 provides in relevant part: "The appellate court may . . . review any instruction given, refused or modified, *even though no objection was made thereto in the lower court*, if the substantial rights of the defendant were affected thereby." (Italics added; see *People* v. *Hannon* (1977) 19 Cal.3d 588, 600 [138 Cal.Rptr. 885, 564 P.2d 1203].)

However, there is merit to the People's argument that evidence of the uncharged offense was admissible on the questions of identity, means and intent. That defendant later the same day robbed a bank with the pistol used to murder the boys, driving as a getaway car the automobile stolen from the boys, certainly tended to show both that he had the means necessary to commit the murders and that he did in fact commit the murders. The evidence was also admissible on the question of intent, indicating as it did that the murders were committed in furtherance of the planned bank robbery.

The relevance of the bank robbery on the remaining issue—"that the defendant had knowledge of the nature of things found in his possession"—is unclear. However, despite the reference in the instruction to "a crime," evidence was introduced concerning another uncharged offense—the burglary of Jim Corbin's residence and the theft of his guns. These guns were the stolen property defendant was charged with receiving, and his participation in the theft of the guns clearly tended to show he knew they were stolen.

## VI

Defendant contends the trial court erred in refusing to give requested instructions on diminished capacity resulting from voluntary intoxication.

The principles governing the duty of the trial court to instruct on diminished capacity were reiterated recently in *People v. Flannel* (1979) 25 Cal.3d 668 [160 Cal.Rptr. 84, 603 P.2d 1]. "In substance when diminished capacity is at issue a trial court first evaluates the evidence. If defendant proffers evidence enough to deserve consideration by the jury, i.e., 'evidence from which a jury composed of reasonable men could have concluded that there was diminished capacity sufficient to negate the requisite criminal intent' [citation], the court must so instruct. A trial court should not, however, measure the substantiality of the evidence by undertaking to weigh the credibility of the witnesses, a task exclusively relegated to the jury. If the evidence should prove minimal and insubstantial, however, the court need not instruct on its effect. [Citations.] In other words, '[t]he court should instruct the jury on every theory of the case, but only to the extent each is supported by substantial evidence.' [Citation.]" (25 Cal.3d at pp. 684-685.)

The trial court explained its refusal to instruct on diminished capacity as follows: "I think I indicated in our informal discussion that the Court in viewing this evidence was satisfied that we did not have a basis for diminished capacity instructions. [¶] First of all, we have no expert testimony in that regard. We have direct evidence on the part of the defendant that even the marijuana that he had admittedly smoked did not in any way interfere with his knowledge of what he was doing. He did not claim any mental blackouts; he did not claim anything that would ordinarily go to the question of mental state in terms of diminished capacity, and I see no reason for giving those instructions."

▮▮▮ Defendant contends substantial evidence of diminished capacity was elicited by the People from Officer Dreis when he testified that, in confessing to the murders, defendant told him: "I was pretty loaded and I didn't know what I was doing. I had smoked two joints before this came down. . . . I didn't know what I was doing."

Respondent points out, however, defendant repudiated that statement at trial. "Q Now, you weren't so under the influence of marijuana on [the day of the murders] that you didn't know what you were doing, were you? A No."

Moreover, defendant's statement to Officer Dreis, even if not repudiated, would not have constituted sufficiently substantial evidence of voluntary intoxication to warrant instructions on diminished capacity. The statement amounted to nothing more than a self-serving claim that, after smoking two "joints" of marijuana, "I didn't know what I was doing." There was no indication how soon before the murders he smoked the marijuana. Nor, as the trial judge pointed out, was there any expert testimony on the effect that amount of marijuana would have on a person such as defendant.[8] Contributing to our conclusion that the evidence of diminished capacity was insubstantial is the testimony of defendant's brother. Danny Harris testified defendant smoked one "joint" of marijuana approximately an hour before the murders and did not appear to be significantly intoxicated. Defendant's gait and speech were normal; he could understand what was said to him and could make himself understood. Finally, defendant's several detailed confessions belie his claim he did not know what he was doing.

---

[8]The importance of expert testimony for a claim of diminished capacity based on voluntary intoxication was recently emphasized in *People v. Frierson* (1979) 25 Cal.3d 142 [158 Cal.Rptr. 281, 599 P.2d 587].

In *People* v. *Carr* (1972) 8 Cal.3d 287 [104 Cal.Rptr. 705, 502 P.2d 513], this court noted with approval: "It has been held that merely showing that the defendant consumed some alcohol prior to commission of the crime without showing the effect of the alcohol on him is not sufficient to warrant an instruction on diminished capacity." (8 Cal.3d at p. 294.) The *Carr* court went on to say: "Similar rules should apply to the consumption of marijuana." (*Id.*, at p. 295.)

Bearing these rules in mind, we may profitably compare the evidence of marijuana intoxication in this case with cases in which this court has held evidence of alcohol intoxication to be too insubstantial to support instructions on diminished capacity. In *People* v. *Flannel, supra*, this court stated: "[W]e are of the opinion that defendant presented no substantial evidence of intoxication. First, defendant consumed relatively small amounts of alcohol over a long period of time. In the early morning, somewhere about 10 a.m., defendant drank about four tall cans of beer and a shot or two of gin. He then went shopping with his girlfriend, and ate a sandwich for lunch. Between 2:30 and 4 that afternoon defendant drank a couple of beers and a shot of whiskey. In *People* v. *Bandauer* [1967] 66 Cal.2d 524, 528 [58 Cal.Rptr. 332, 426 P.2d 900], we found evidence of intoxication insufficient to require an instruction on diminished capacity if the defendant had 'six or seven beers during the six hours he was at various bars . . ., and he did not appear to be intoxicated.' Similarly, in *People* v. *Spencer* [(1963) 60 Cal.2d 64,] 88-89, we found evidence of intoxication 'minimal,' and therefore erroneous instructions immaterial, when defendant testified that he had had '"about three shots of whiskey" and some beer, and was "pretty well plastered."' Having observed defendant's behavior, the arresting police officers, however, testified that defendant was not under the influence of intoxicating liquor." (25 Cal.3d at p. 685.)

## VII

Defendant contends the excusal of juror Susan McDevitt was error under *Witherspoon* v. *Illinois* (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770]. *Witherspoon* holds that a prospective juror with scruples against the death penalty may not be excused for cause on that basis unless he makes it unmistakably clear he would automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at trial. (391 U.S. at p. 522, fn. 21 [20 L.Ed.2d at p. 785].) That standard was clearly satisfied here.

The critical exchange occurred during voir dire by defense counsel.

"Q . . . are you saying that in no instance could you ever vote for the death penalty?

"A According to my own conscience? I would not use the death penalty, no.

"Q Are you saying you could never in any instance, if you are selected as a juror, vote for the death penalty?

"A No, never.

"Q If you were chosen as juror and the Court instructed you that it was your duty to consider both penalties, is it your testimony that you could not do so; that you would automatically and without regard to any evidence vote against the death penalty?

"A That's according to my own conscience.

"Q That is your belief?

"A Yes."

Defense counsel thereupon stated he had no further questions of Ms. McDevitt, the prosecutor challenged her for cause, and the court excused her. The exclusion was proper.

## VIII

Defendant contends the exclusion of jurors opposed to capital punishment results in an unrepresentative jury on the issue of guilt and substantially increases the risk of conviction. This contention, voiced on appeal and amplified in a petition for writ of habeas corpus which we earlier denied (*In re Harris*, Crim. 21341, denied by minute order on 22 October 1980), lacks merit. (*Hovey* v. *Superior Court* (1980) 28 Cal.3d 1 [168 Cal.Rptr. 128, 616 P.2d 1301].)

## IX

We now consider defendant's contention that the trial court made a number of erroneous evidentiary rulings during the penalty phase.

## A

■ Defendant contends the court erred by permitting the People to call defendant's wife in rebuttal without having given him notice as required by section 190.3.

Then, as now, section 190.3 provided in relevant part: "Except for evidence in proof of the offense or special circumstances which subject a defendant to the death penalty, no evidence may be presented by the prosecution in aggravation unless notice of the evidence to be introduced has been given to the defendant within a reasonable period of time as determined by the court, prior to the trial. *Evidence may be introduced without such notice in rebuttal to evidence introduced by the defendant in mitigation.*" (Italics added.) The italicized exception is applicable here. No notice was required because the People called defendant's wife to rebut his testimony in mitigation.

## B

■ Defendant contends psychiatrist Wait Griswold, testifying for the People in rebuttal during the penalty phase, usurped the function of the jury, "set[ting] himself up as a human lie detector concerning whether or not [defendant] felt remorse for his having killed the victims."

Defendant himself raised the question of remorse. As stated, having claimed during the guilt phase to have had nothing to do with the murders, defendant recanted that testimony during the penalty phase, expressly admitting the crimes and stating he was "sorry." He then sought to support his claim of remorse by calling Deputy Mendoza who testified that when he inquired into defendant's emotional state after he cut his wrist and reportedly attempted to stab himself with a pencil, defendant appeared to feel remorse for his crimes.

Dr. Griswold's testimony on direct examination was entirely unobjectionable. The psychiatrist testified he had examined defendant and was of the opinion he had an "antisocial personality"—a character disorder also known as "sociopathic" or "psychopathic" personality. Dr. Griswold stated sociopaths are commonly manipulative and, drawing upon his extensive experience as a prison psychiatrist, explained that in prison this manipulative tendency might be expressed by "ingra-

tiating themselves with prison personnel [and] by...making what appear to be suicidal gestures in order to call attention to themselves or to manipulate themselves out of a difficulty."

Framing his question carefully, the prosecutor did not ask Dr. Griswold whether he believed defendant when he said he was remorseful. Rather, he asked, "if a person were truly a sociopath and had committed the crimes of the type that you discussed with [defendant], would you expect that person to truly feel remorse for those crimes?" Dr. Griswold responded, "No, I would not." It was defense counsel who asked Dr. Griswold whether he credited defendant's claim of remorse. Asked on cross-examination, "So you venture no opinion whether or not he is remorseful at this time," the psychiatrist responded, "No opinion except that I would doubt it very much." The prosecutor carefully avoided encroaching upon the jury's province when he examined Dr. Griswold on direct. If defense counsel failed to exercise such care in cross-examining the psychiatrist, defendant may not now be heard to complain of the lapse.

## C

Defendant contends the court erred in refusing to admit testimony of Clinton Duffy, former warden of San Quentin, and Howard Brodie, a CBS correspondent and courtroom artist, explaining how the death penalty is carried out. Evidence presented at the penalty phase should focus on "the character and record of the individual offender and the circumstances of the particular offense." (*Woodson v. North Carolina* (1976) 428 U.S. 280, 304 [49 L.Ed.2d 944, 961, 96 S.Ct. 2978].) The proffered testimony had no bearing on those issues and thus was properly excluded.

## D

Concluding this line of argument, defendant contends the court erred in admitting evidence that while in jail awaiting trial for the present offenses defendant was found in possession of a wire garrote and prison-made knife. Defendant is precluded from raising this issue on appeal by his failure to preserve the point by appropriate objection in the trial court. (Evid. Code, § 353; *People v. Rogers* (1978) 21 Cal.3d 542, 547-548 [146 Cal.Rptr. 732, 579 P.2d 1048].) Moreover, the evidence was clearly admissible under section 190.3, which in re-

levant part provided then, as now: "However, no evidence shall be admitted regarding other criminal activity by the defendant which did not involve the use or attempted use of force or violence *or which did not involve the expressed or implied threat to · use force or violence.* As used in this section, criminal activity does not require a conviction." (Italics added.) Possession of the garrote and the knife clearly involved an implied threat to use force or violence.

X

■ Defendant contends that instructing the jury pursuant to former CALJIC No. 8.89 was error under former section 190.4, subdivision (b), and *People* v. *Gainer* (1977) 19 Cal.3d 835 [139 Cal.Rptr. 861, 566 P.2d 997, 97 A.L.R.3d 73].

Former CALJIC No. 8.89 provided in pertinent part: "It is now your duty to determine which of the two penalties, death or confinement in the state prison for life without possibility of parole, shall be imposed on defendant. After having considered all of the evidence in this case and having taken into account all the applicable factors upon which you have been instructed, you shall determine whether the penalty to be imposed on defendant shall be death or confinement in the state prison for life without the possibility of parole." (Supp. Service, pamp. No. 1 (1978).)

Former section 190.4, subdivision (b), provided in pertinent part: "If the trier of fact is a jury and has been unable to reach a unanimous verdict as to what the penalty shall be, the court shall dismiss the jury and impose a punishment of confinement in state prison for life without possibility of parole." (Added by Stats. 1977, ch. 316, § 12, pp. 1260-1262, and repealed by § 9 of Initiative Measure approved Gen. Elec. (7 Nov. 1978).)[9]

Defendant argues that instructing the jury it "shall determine" whether the penalty is to be death or life imprisonment without possibility of parole creates the false impression that there is no third alternative, namely, deadlock.

---

[9]Section 190.4, subdivision (b), now provides that a new jury is to be impaneled to try the penalty issue if the original jury is unable to reach a unanimous verdict. Upon a second failure to reach unanimity, the judge has discretion to impanel a third jury or to impose a life sentence without possibility of parole. (Added by § 10 of Initiative Measure approved Gen. Elec. (7 Nov. 1978).)

*People* v. *Gainer, supra,* is inapposite. No "dynamite" instruction of the sort condemned in *Gainer* was given here. This jury was never dead-locked. It was not instructed that the case "must at some time be decided." (Cf. *People* v. *Gainer, supra,* 19 Cal.3d at pp. 841, 851-852.) Nor were minority jurors admonished to reconsider their opinions in light of the fact that the majority had taken the opposite position. (*Id.,* at pp. 841, 847-851.) Moreover, CALJIC No. 17.40, the continued use of which was commended in *Gainer,* was given here.[10] No error appears.

## XI

Finally, defendant contends imposition of the death penalty under the 1977 statute would constitute cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments to the United States Constitution. Defendant admittedly does no more than ask us to reconsider the various arguments rejected in *People* v. *Frierson* (1979) 25 Cal.3d 142, 172-188 [158 Cal.Rptr. 281, 599 P.2d 587] (opn. by Richardson, J.). We decline to do so. (See *People* v. *Jackson, supra,* 28 Cal.3d 264.)

None of defendant's contentions having merit, the judgment imposing the death penalty is affirmed.

Richardson, J., and Newman, J., concurred.

**TOBRINER, J.,** Concurring.—For the reasons set forth in the dissenting opinions of the Chief Justice and Justice Mosk in *People* v. *Jackson* (1980) 28 Cal.3d 264 [168 Cal.Rptr. 603, 618 P.2d 149], I continue to believe that the death penalty statute under which defendant was convicted is unconstitutional. Until the majority opinion in *Jackson* is reversed by the United States Supreme Court or is overruled by a majority of this court, however, I consider myself bound by that decision's holding. Because I agree with the present majority's conclusion that under *Murphy* v. *Florida* (1975) 421 U.S. 794 [44 L.Ed.2d 589, 95 S.Ct. 2031], the record in this case does not demonstrate that defendant was denied a fair trial, I concur in the judgment.

---

[10]CALJIC No. 17.40 provides: "Both the People and the defendant are entitled to the individual opinion of each juror. It is the duty of each of you to consider the evidence for the purpose of arriving at a verdict if you can do so. Each of you must decide the case for yourself, but should do so only after a discussion of the evidence and instructions with the other jurors. You should not hesitate to change an opinion if you are convinced it is erroneous. However, you should not be influenced to decide any question in a particular way because a majority of the jurors, or any of them, favor such a decision." (4th ed. 1979.)

**BIRD, C. J.**—I respectfully dissent.

## I.

These are terrible crimes of which appellant stands convicted, exceptionally cold-blooded and senseless. The reaction of San Diego County to their commission is understandable and, perhaps, even natural. The question before this court, however, is whether, amidst the clamor which attended that county's most notorious crime of the year, it is reasonably likely that appellant was not accorded a fair trial—"the most fundamental of all freedoms"[1]—on the issues of guilt or of punishment.

Press coverage[2] of appellant and his crimes began with his capture for bank robbery on July 5, 1978. Two citizens observed appellant and his brother Daniel leave the bank after the robbery, and one of them followed the brothers as they drove back to their residence. This witness notified the police, and a combined "SWAT" and FBI team soon surrounded the house where appellant and Daniel were arrested. The police siege of the home was broadcast over local television, and the arrest of the robbers was the lead story in the San Diego Evening Tribune.[3]

---

[1]*Estes* v. *Texas* (1965) 381 U.S. 532, 540 [14 L.Ed.2d 543, 548, 85 S.Ct. 1628].

[2]This opinion uses the terms "press" and "publication" to refer not only to written journalism but also to the television and radio broadcast media.

[3]With a circulation of 131,000 newspapers daily (except Sunday), the Evening Tribune is the second ranking newspaper in San Diego County. The San Diego Union has the largest circulation (200,000 daily; 300,000 Sunday). Other newspapers with substantial circulation in the county include the Los Angeles Times (41,000 daily; 52,000 Sunday), the Escondido Times-Advocate (31,000), the El Cajon Daily Californian (14,000), and the six Sentinel Newspapers (total local circulation 85,000). San Diego County has a population of about 1.7 million persons of whom 800,000 are registered voters. (Cal. Sect. of State, Rep. of Registration (Oct. 1978) p. 4.)

It is appropriate at this point to note some of the more obvious difficulties that arise when one attempts to determine the impact of publicity upon a jury pool by comparing a newspaper's circulation statistics with the gross population of the county. At the outset, it has been recognized that a newspaper's circulation statistics—that is, the number of copies sold or given away—significantly understates the number of persons actually reached by that paper. For example, a family would generally purchase only one copy of a newspaper to be shared among all family members.

On the other hand, since at least some individuals or businesses subscribe to more than one newspaper, one cannot obtain the number of newspaper subscribers simply by adding up the circulation statistics of each paper in the county.

Finally, an assessment of the impact of adverse publicity upon a county's potential jury pool cannot accurately be obtained by comparing the number of persons reached by the publicity with the *total* population of the county. San Diego's gross population—1.7 million—includes numerous persons who are statutorily ineligible to serve as jurors, for example, aliens and persons under the age of 18 years. A more realistic esti-

While initially the incident appeared to the press and, apparently, to law enforcement authorities to be "simply" a bank robbery, the situation quickly changed. Daniel told about the murders, laying the blame on appellant. The officers were shown the murder site by Daniel and the local television stations broadcast the recovery of the victims' bodies.

The story was front page news the following day (July 6th) in the San Diego Union (two front page stories), the Evening Tribune (four front page stories), and the Los Angeles Times (one story). The headlines described the crimes as "senseless murder" and observed that the community of Mira Mesa was "stunned." The Union mentioned that appellant was on parole from prison, that at age 11 he had been arrested for cruelty to animals and burglary. Articles in the Evening Tribune related in both headline and text that appellant was on parole for a previous homicide and that his mother was herself on probation for bank robbery. An interview with appellant's parole officer was reported. In it, the officer revealed further details of appellant's manslaughter conviction and of his prior record for escape from a youth camp and for running away from home. Another official related that appellant had been on welfare at the time of the previous killing and "[i]t was hard to believe the filth" in his home.

That evening a local television station broadcast an interview it had conducted with appellant's father. In an emotional statement, the father told the reporter of a conversation he had had with appellant following his arrest in which appellant had admitted the killings. The story was picked up and disseminated by United Press International (UPI). (Shortly thereafter, appellant's father left the area.)

The stories by UPI for each of the following two days reported appellant's status as an ex-felon. Similarly, on July 6th, 7th, and 8th, the Associated Press (AP) coverage included references to appellant's prior record, including his juvenile record and his escape from the youth camp. AP also published its own interview with appellant's parole officer and with the prosecutor in the prior manslaughter case. The prosecutor (now a judge) was quoted as stating that the prior homicide was a "stabbing death."

---

mate of the jury pool's size might be registered voters. (See Code Civ. Proc., § 204e.) (There were 800,000 registered voters in San Diego County at the time appellant's jury was selected.)

Taking into account these various caveats, it seems reasonable to conclude that the several newspapers listed at the beginning of this footnote do have an extensive readership among persons constituting the jury pool of San Diego County.

By July 7th, Daniel's confession to the police had been released to the press. It was reported that day in the Union, the Evening Tribune, the Times-Advocate, the Daily Californian, and the Vista Press, as well as by AP and three local television stations. The front page coverage in the Union included as headline "The Chilling Story of How 2 Boys Died." The text of the article reported the police account of Daniel's statements that appellant "thought up the whole thing" and that appellant shot one of the victims as he walked along carrying his hamburger. The Tribune's front page story was headlined "2 Boys Were Shot Without Warning." The text also noted the boys' bullet-riddled bodies and partially eaten hamburgers. A deputy coroner was reported as indicating that one of the boys had been shot without warning in the back.

The July 7th Union ran a separate story, headlined "Killings Suspect On Parole For '75 Slaying." Included in this article was an extensive interview with a member of the Imperial County Sheriff's Department. This officer detailed the facts surrounding appellant's prior conviction and opined, "I knew he [appellant] was going to pull something. He beat that guy to death [in 1975]...beat him so hard on the head, he died of hemorrhaging."

The Union also published an editorial entitled, "Sorrow and Indignation," which stated: "We must bespeak the sense of grief and outrage that San Diegans share over the[se] mindless murders....[¶] The circumstances of this tragedy are particularly appalling....[¶] Because the horrible crime that snuffed out the lives of these young men could have happened to anyone, public sorrow and indignation are also tinged with fear." It further noted the "widespread belief that murderers may be paroled within a few years. This awful belief is well founded..." since the two victims' "murderer was not kept behind bars where he belonged." The editorial concluded: "If this crime, which could involve a confessed murderer paroled too early, can result in having punishment more nearly fit the crime in California, then [the victims] will not have died for nothing."

Further coverage in the Union, the Times, and the Daily Californian notified their readers that appellant's mother had been convicted for bank robbery. AP and UPI did the same. Appellant's prior manslaughter conviction was the subject of coverage by the Times-Advocate, the Vista Press, the Daily Californian, and AP.

On July 8th, the Union published another article concerning Daniel's confession and appellant's prior conviction. Headlines noted that the prosecution was seeking the death penalty for appellant. The article reported that there was considerable community outrage at the decision of the Community Release Board (C.R.B.) to parole appellant for the manslaughter conviction. A high ranking prison official was quoted as stating, "it's a reality that the Community Release Board made a mistake in this case. . . ."

That day's edition of the Evening Tribune carried similar reports about the prosecution's decision to seek the death penalty. Calling the offenses an "apparent willful execution of two innocent teen-agers," the chief deputy district attorney stated that "[t]he death penalty is designed to deal with this kind of offense." He also was quoted as stating that the evidence indicated that Daniel "did not personally participate" in the killings. *The chief deputy further admitted that it might be difficult to empanel an impartial jury in the county after the published reports of Daniel's confession which laid the blame for the shootings on appellant.*

The Times of July 8th contained the story of Daniel's confession, an interview with the judge who had been the prosecutor during appellant's prior manslaughter proceedings, and an observation that the victims "appeared to have been shot down in cold blood." It again noted that appellant's mother had been convicted of bank robbery.

On Sunday, July 9th, the Union published a front page story and photograph of the funeral of one of the victims. The story quoted extensively from the minister who presided at the funeral and who described the perpetrators as "cruel, selfish, heartless people devoid of feeling and devoid of conscience." The article referred to appellant's status as a parolee for manslaughter, and it reiterated the prosecution's decision to seek the death penalty. The article then observed that no execution had been carried out in California in 11 years.

Later that same day, a television station conducted a one-question public opinion poll on its "Telepulse" show: "Do you agree with the death penalty demand in murder of two Mira Mesa youths?" Viewers phoned in their responses: 690 yes, 70 no.

On July 10th, both the Union and the Evening Tribune carried stories on the funeral of the second victim. The latter's article was on

the front page. On July 11th, the Union published an article concerning the mother of one of the deceased boys and noted appellant was an "ex-convict on parole from a 1975 manslaughter conviction...."

The Evening Tribune of July 12th carried a front page article under the headline, "Slain boy's mother finds words: It's senseless." The story stated that appellant was on parole for "a stabbing death." Accompanying the article was a large photograph of one of the deceased boys performing stunts on his bicycle. An article in the Times again referred to appellant's prior conviction and parole status. The Mira Mesa Sentinel carried one story about the victims' funerals and a second story and an editorial concerning the citizens who had aided in appellant's capture. The Sentinel reported that a sports scholarship had been set up by the local P.T.A. to honor the victims' memory and that another fund was collecting contributions for their families. It also related appellant's prior conviction, as did three local television stations. These stations also broadcast interviews with appellant's parole officer. Another newspaper editorialized: "With a past history of violent crime, and a murder conviction, to boot, what was Robert Harris doing on the streets?"

Two days later, the entirety of the Union's letters to the editor page was devoted to letters of outrage at the crimes and at the C.R.B.'s release of appellant. Appellant was called a "recidivist psychopath" and a "subhuman type." In the days which followed, other letters were printed demanding the death penalty for appellant. The Union's editorial cartoon on July 17 showed pollution from a pipe labeled "Paroled Murderers" being poured into a stream labeled "Society."

In the next two days, the Union and the Tribune carried brief stories on the scholarship fund which had been created as a memorial to the two youths. And on July 19th, a television station broadcast an editorial, asking "whether this man, an ex-convict, should have been out of prison in the first place. Harris was paroled last January after serving less than two and a half years for beating to death a 19-year-old friend after a drinking spree....Parole authorities rejected the warnings by an Imperial County sheriff's officer, familiar with the case, that Harris was a potential danger to society."

About this time, the publicity surrounding this case in San Diego County developed a new aspect, as the two major prosecutorial officers in the county became engaged in a sharp public dispute over which office would "get first crack" at prosecuting appellant. The local United

States Attorney's office was responsible for the prosecution of the bank robbery offense, and the county district attorney for the homicides. Each office issued statements indicating what sentence appellant would likely obtain if convicted in its respective court. The United States Attorney claimed that the federal charges were an "insurance policy." against appellant's early release by the parole board. After the district attorney's office responded that it was seeking the death penalty—a punishment not available in the federal courts for bank robbery—the United States Attorney held a televised news conference at which he expressed the opinion that the California death penalty law was unconstitutional.

The district attorney's office took the public position that if the federal charges were tried first, the state might lose the opportunity to try appellant and obtain a death sentence. The district attorney attempted to delay appellant's arraignment in federal court, and members of the office accused the United States Attorney of "political grandstanding." The United States Attorney responded that it was the county prosecutors who were "grandstanding."

When the federal authorities obtained a trial date of October 3, the Tribune noted this "tightens the race between the two jurisdictions as to which will be the first to try the case." An assistant district attorney described the "competition" between his office and the federal prosecutors as an "awkward situation." On August 7, the district attorney was able to have the state trial set on a date earlier than October 3, and the press reported that the district attorney had "moved ahead" in his efforts to "beat federal authorities to the punch in prosecuting the Harris brothers."

Attorneys in the district attorney's office privately told the press that the motivation of the United States Attorney was "politics." They claimed "he is politically ambitious and . . . he knows the case will receive a lot of publicity. . . ." The United States Attorney responded that he was merely seeking "maximum protection of the community." Members of the district attorney's office were said to "scoff" at this justification.

On August 10, the Union published a lengthy article on the jurisdictional dispute, reporting that a senior federal parole officer "disputed" the United States Attorney's computation of appellant's federal sen-

tence. This official, who calculated a prison term "far under" the term mentioned by the United States Attorney, "cannot understand why [the United States Attorney] is insisting on prosecuting the two brothers from Visalia." County prosecutors were again said to claim that federal involvement was "for the sake of publicity." An assistant legal counsel for the C.R.B. computed for the Union that "the least" appellant would serve in state prison would be a term of years well beyond the term calculated by the federal parole officer.

These events were, duly reported by the Union, the Times, the Evening Tribune, and by the local television stations over a two and one-half week period from July 20th through August 10th, and beyond.

Coverage was not limited during this time period to the political dispute. Articles appearing in the Times of July 22d and 25th and August 8th and in the Union and the Tribune of July 22d and 25th and August 9th all reported further events in the case. On August 12th and 13th, the press reported that the confessions of both appellant and his brother had been introduced at their preliminary hearing. The Times story was headlined, "Harrises Bare Guilt to Them, Officers Testify." Portions of Daniel's confession were particularly publicized. According to police witnesses, appellant told Daniel that he wanted to kill everyone in the bank, and only after Daniel pleaded "there would be no more killings" did appellant relent. The Times carried Daniel's assertions that appellant had eaten the victims' hamburgers and had asked, "Wouldn't it be fun to pose as police officers and inform the next of kin that their son had been murdered?" Daniel was reported to be so fearful of appellant that he requested—and was permitted—to be kept in a jail cell separate from appellant.

Meanwhile, community reaction to the crimes was being expressed in other ways. The P.T.A.'s of seven schools combined to set up the memorial athletic scholarship in Mira Mesa. A local stereo store advertised that a portion of its income would be donated to that fund. Another memorial fund was set up to collect contributions to the boys' families. The bank which had been robbed gave rewards to three persons who had helped in the capture of appellant. It also took out large advertisements to laud the three, and the Tribune published an editorial commenting on these advertisements and again praising the three citizens. In its news broadcasts, a television station presented two of the citizens with its Good Citizen Award.

Numerous other details about the crimes, the court proceedings, appellant's background, and the victims were reported and reiterated in the press. Appellant and Daniel were consistently referred to as the "brothers from Visalia" (Tulare County). The two victims were described as popular teenagers and best friends. The father of one of the boys was a police officer who participated in appellant's arrest; a sister of one of the boys was inside the bank when Daniel and appellant robbed it. These facts and coincidences were widely disseminated by the press. Further coverage was given to statements by an officer in Imperial County that he had unsuccessfully tried to prevent appellant's release on parole. A prison official was quoted as saying the C.R.B. had made a "mistake" by paroling appellant.

By mid-August members of the district attorney's office admitted to the press that this case received "the most news coverage of any this year in San Diego." Polls conducted that month by both the prosecution and defense more than substantiated this admission. Although differing considerably in their methodology, the pollsters for both sides found an extremely high public awareness of the crime. As one pollster stated, "this is the highest awareness factor in any of the polls that I have done regarding awareness of a particular alleged crime." Indeed, so well known was this case that by September 1st—only five days prior to the hearing on the change of venue motion—the Union published an editorial addressing the contemplated release from prison of two persons convicted of murder. The editorial was entitled "From Worry to Outrage" and stated: "San Diegans *cannot forget* the case of a *paroled killer* now charged with the vicious slaying of two teenagers, unfortunate enough to cross his path."

After the change of venue motion was denied, appellant filed a petition for a writ of mandate, seeking to overturn that ruling. The petition was summarily denied by the Court of Appeal and by a four-to-three vote in this court.

Although diminished somewhat in frequency, the publicity given to this case by the press continued well past the change of venue motion. The extent and nature of the coverage between that motion and jury selection, can be gleaned by the fact that one prospective juror, who was called to try this case, indicated that he had been in Alaska during the entire summer and "didn't know a thing about [the case] until [he] returned in September," but he "read in the paper quite a bit about it

since then." Although this juror recalled "not a great deal" of the details of the case, he had read enough to enable him to form the opinion that appellant was guilty. He was excused for cause.

Another indication of the extent of pretrial publicity comes from the voir dire in this case. Nearly 11 full court days were needed to obtain a jury of 12. Ninety-six prospective jurors were voir dired for those twelve positions. Of the 96, 90 percent had some prior information about the case, ranging from vague recollections to certainty of appellant's guilt. Twenty of the ninety-six were excused for cause due to the publicity, and appellant exhausted his twenty-six peremptory challenges.

Of those who had prior knowledge, most obtained their knowledge from publicity or discussions prior to coming to court, but four prospective jurors with no prior knowledge of the offense received information from other prospective jurors in the jury lounge. Indeed, of 13 jurors who were asked or volunteered information about what was occurring in the jury lounge, 11 indicated they had heard such discussions. One prospective juror told the court that "[m]any people expressed opinions with reference to guilt or innocence"; another indicated that in the jury lounge conversations she overheard, "their opinion had already been formed"; a third indicated he heard discussions "throughout the jury lounge."[4]

Of the twelve jurors empanelled to decide the case, nine had some exposure to the pretrial publicity, and one juror, who had no prior exposure, heard jury room discussions. Among the twelve who served, one had seen the television interview with appellant's father, although this juror claimed to remember only that the father was "really broken up"; he did not mention that the father told the television reporter his son had admitted committing the killings. A second juror indicated that this case "was duly noted by I think everybody in our circle when the incident, you know, came to the news." This juror stated that "I imagine I did" express or form an opinion regarding appellant's guilt, but this was not a "definite judgment[ ]," and she indicated she had no opinion on guilt "at this time." The remaining jurors admitted to having less knowledge than these two.

---

[4]At one stage in the voir dire proceedings, the trial judge called in the prospective jurors and admonished them to stop discussing the case in the jury lounge.

## II.

The right to a "fair trial in a fair tribunal" is a basic component of due process.[5] So basic is this principle that it has been termed "the most fundamental of all freedoms."[6] "It is a right essential to the preservation and enjoyment of all other rights, providing a necessary means of safeguarding personal liberties against government oppression. [Citations.]" (*Nebraska Press Assn.* v. *Stuart* (1976) 427 U.S. 539, 586 [49 L.Ed.2d 683, 713, 96 S.Ct. 2791] (conc. opn. of Brennan, J.).)

The Supreme Court has "insisted that no one be punished for a crime without 'a charge fairly made and fairly tried in a public tribunal free of prejudice, passion, excitement, and tyrannical power.'" (*Sheppard* v. *Maxwell* (1966) 384 U.S. 333, 350 [16 L.Ed.2d 600, 613, 86 S.Ct. 1507], citation omitted.) Thus, whenever there appears a "reasonable likelihood" that the dissemination of potentially prejudicial news prior to the trial will prevent a fair trial, the trial must be postponed until the threat abates or the case is transferred to another county not so permeated with publicity. (*Id.*, at p. 363; *Maine* v. *Superior Court* (1968) 68 Cal.2d 375, 383-384 [66 Cal.Rptr. 724, 438 P.2d 372]; *Fain* v. *Superior Court* (1970) 2 Cal.3d 46, 54 [84 Cal.Rptr. 135, 465 P.2d 23].)

The courts have identified several dangers to a fair trial which are relevant to the present case. Such a danger can exist if there is bias against the accused, as when the community harbors hostility toward the suspect and/or when pretrial publicity is inflammatory. Recognizing that the press both reflects[7] and shapes[8] the community's pattern of thought, courts have looked to the nature and extent of press coverage as a means of ascertaining bias or hostility toward an accused. Courts have also looked to other factors from which community bias might be inferred, such as the status of the accused in the community, the status of the victim, the nature of the offense, the size of the community, and whether the case becomes involved in local politics.

A second and separate kind of danger to a fair trial may result if extensive pretrial publicity has tended to establish the accused's guilt. As

---

[5]*In re Murchison* (1955) 349 U.S. 133, 136 [99 L.Ed. 942, 946, 75 S.Ct. 623].

[6]*Estes* v. *Texas, supra,* 381 U.S. at page 540 [14 L.Ed.2d at page 548].

[7]See *Irvin* v. *Dowd* (1961) 366 U.S. 717, 725 [6 L.Ed.2d 751, 757, 81 S.Ct. 1639].

[8]See *Irvin* v. *Dowd, supra,* 366 U.S. at page 726 [6 L.Ed.2d at page 758]; see also *Clifton* v. *Superior Court* (1970) 7 Cal.App.3d 245, 251 [86 Cal.Rptr. 612].

the Court of Appeal has stated, "[a] reasonable likelihood of unfairness may exist even though the news coverage was neither inflammatory nor productive of overt hostility. [Citation.] When a spectacular crime has aroused community attention and a suspect has been arrested, the possibility of an unfair trial may originate in widespread publicity describing facts, statements and circumstances which tend to create a belief in his guilt." (*Corona v. Superior Court* (1972) 24 Cal.App.3d 872, 877 [101 Cal.Rptr. 411].)

In determining the likelihood of this form of prejudice, the courts look again at the extent and content of press coverage. Especially significant in this regard is whether there has been widespread publicity concerning confessions or admissions by the accused, accusations by an alleged crime partner, prior similar criminal conduct by the accused, or statements by presumably knowledgeable officials indicating their belief in the accused's guilt.

The record in the instant case contains virtually every factor which this court has heretofore considered relevant to the resolution of a change of venue question. The record is replete with indications of community bias. The press reported the "stunned" reaction of the community to the murders and consistently mentioned the "outrage," "disgust," "indignation," and "fear" shared by San Diegans as a result.

Only a few days prior to the hearing on the change of venue motion, the county's largest newspaper wrote that "San Diegans cannot forget" these "vicious" killings. Appellant was described by members of the community as "cruel, selfish, heartless" and "devoid of feeling, and devoid of conscience." A police officer was widely quoted as stating appellant was dangerous, unstable, and violent. The press reported that even appellant's brother Daniel was afraid of him and that Daniel "was happy to be [in confinement] away from his older brother." Press coverage of even routine court appearances frequently mentioned that appellant was brought to court in chains. (Cf. *People v. Duran* (1976) 16 Cal.3d 282 [127 Cal.Rptr. 618, 545 P.2d 1322, 90 A.L.R.3d 1].)

Appellant was graphically portrayed in a cartoon as sewage polluting the community. In the letters to the editor, he was called a "subhuman type," a "recidivist psychopath," a "dreadful man," and a "beast." There were demands for his execution, and an announcement that citizens will "speak out and act if justice is not served . . . ."

Appellant's criminal history was a constant subject of public attention. The press frequently noted his arrest at age 11 for cruelty to animals. Other arrests and convictions for auto theft, runaway, escape from youth camp, burglary, and parole violation were brought out. His prior status as a welfare recipient and the "filth" of his house were deemed newsworthy. Even his *mother's* conviction for bank robbery was prominently featured. Most damaging, however, was appellant's prior manslaughter conviction, the details of which were repeated many times. The press carried interviews with a judge who had been the prosecutor for this offense, with police officers involved in its prosecution, and with his parole officer. Appellant was referred to by the leading newspaper as a "paroled killer."

The community was incensed that the C.R.B. had paroled appellant. This anger was expressed in editorials, in letters to the press, in comments by local law enforcement officials. The press recounted the efforts of a police officer in another county to prevent appellant's parole. Stories were carried attributing to prison officials the admission that it had been a "mistake" to release appellant. Editorials attacked the "feeble excuses" and "lame responses" of the C.R.B. for releasing appellant.

In prior decisions, this court has found the status of the accused and the victim to be significant. For example, in *Fain* v. *Superior Court, supra,* 2 Cal.3d at page 52—a case in which a change of venue was ordered—the court noted that the defendant "had been a resident of the . . . area [where the crime took place] for only a few months prior to the crimes, and had not been integrated into the community." The same can be said of appellant; indeed, appellant and his brother Daniel were routinely referred to as "brothers from Visalia." Appellant's contacts with yet another county (Imperial) were amply emphasized in connection with the reportage of his prior manslaughter conviction there.[9]

In *Fain,* this court also considered the fact that "the victims were popular local teenagers, whose fate drew expressions of public sympathy and aroused hostility towards the defendant[ ]." (2 Cal.3d at p. 51.) In

[9]The majority opinion asserts that appellant "lived in the same community as his victims and worked in San Diego." (Maj. opn., *ante,* at p. 949.) This assertion does not accurately reflect the way appellant was protrayed by the press. Usually, he was said to be "from Visalia." According to one newspaper in Mira Mesa, appellant was a "transient renter." At the very least, appellant was no more integrated into the community than was the defendant in *Fain, supra,* whose minimal community ties were held to be a factor favoring a change of venue.

the present case, too, the victims were also teenagers popular in their community, best friends on their way to go fishing when kidnaped; and one of them was the son of a police officer.[10] Public sympathy and tribute came in many forms. The Union noted the "hundreds of people—strangers, mostly—who rushed to [the] comfort" of the victims' families. Funeral arrangements were made for one family by a church of another faith.

A college scholarship fund was set up in memory of the boys by the P.T.A.'s of seven schools, and another fund collected donations for their families. The existence, of these funds was publicized countywide. A local retail establishment advertised that it would donate portions of its income to the scholarship fund. Rewards were given to citizens responsible for appellant's capture. The bank took out advertisements lauding them, the county's largest newspaper praised them, and a major television station gave them its Good Citizen Award.

This court has also observed that the nature and gravity of the crime, as reported in the press, "may reasonably be taken into consideration in determining the risk of prejudice." (*Fain* v. *Superior Court, supra*, 2 Cal.3d at p. 54; see also *Maine* v. *Superior Court, supra*, 68 Cal.2d at p. 385.) Appellant's was a capital crime of utmost gravity. Moreover, the shocking nature of the case was thoroughly explored in the press. A deputy coroner told the press that one boy had been shot without warning in the back and that the other boy was flushed out of hiding and killed. At a press conference, the prosecutor termed the slayings an "apparent willful execution of two innocent teenagers." Gruesome details were frequently noted, from appellant's eating the victims' food to his desire to notify the boys' families of the slayings.

In addition, this case took on political overtones as the two major prosecutorial offices in the county engaged in public maneuvering in order to be first to bring appellant to justice. (Cf., *People* v. *Tidwell* (1970) 3 Cal.3d 62, 71 [89 Cal.Rptr. 44, 473 P.2d 748]; see also *Maine* v. *Superior Court, supra*, 68 Cal.2d at pp. 386-387.) Each side in the dispute seemed to boast about the severity of the sentence appellant would receive in its jurisdiction. Each accused the other of "grandstanding." The United States Attorney was said to be "playing politics." The

---

[10]Prior to the deaths of the boys, neither they nor their families were known outside the community of Mira Mesa. Their virtues were, however, made known to the county at large following their deaths, and the community's warm sympathy was displayed countywide. As the mother of one of the boys explained, "the whole of San Diego was just fabulous."

press perceived the situation as a "race" between two antagonistic competitors.

Much of the publicity discussed thus far not only revealed community bias toward appellant but also assumed his guilt: the prior conviction for homicide (see *People* v. *Fries* (1979) 24 Cal.3d 222, 230 [155 Cal.Rptr. 194, 594 P.2d 19]); the reported details of the crime; and the expressions by the prosecutor and other local officials as to appellant's guilt. In addition, however, the press on numerous occasions carried the story of Daniel's statements, which laid the full blame for the murders on appellant. Appellant's own admission to the crimes was carried over television, via an emotional interview with appellant's father. This broadcast was seen by at least one of the jurors who decided appellant's guilt. His confession was disclosed when the preliminary hearing transcript was made public.

One relevant factor which this court has considered in the past but which is not present in the instant case is the small population of the community from which the jury is drawn. San Diego County is populous, in terms of both absolute numbers and voter registration. (Cf., *ante*, fn. 3.) However, "population size alone is not determinative." (*Fain* v. *Superior Court, supra*, 2 Cal.3d at p. 52, fn. 1; see also *Smith* v. *Superior Court* (1969) 276 Cal.App.2d 145, 150 [80 Cal.Rptr. 693]; *Lansdown* v. *Superior Court* (1970) 10 Cal.App.3d 604, 609-610 [89 Cal.Rptr. 154].)

Contrary to *Fain, Smith*, and *Lansdown*, today's majority opinion appears to find that the size of the community is controlling. (Maj. opn., *ante*, at p. 949.) The majority blithely ignore the cases in which changes of venue have been ordered from populous counties, including one county which is considerably larger than San Diego. (See *Smith* v. *Superior Court, supra*, 276 Cal.App.2d 145 [L.A. County, population 7 million];[11] *Lansdown* v. *Superior Court, supra*, 10 Cal.App.3d 604 [Kern County, population 300,000].) The fallacy of the majority's reasoning was fully set forth in *Smith*: "Carried to its logical conclusion, the [majority's] argument, if valid, would require that all motions for a change of venue in [a populous county] must be denied because of its population, regardless of the amount of pretrial publicity which surrounds a notorious criminal case. This contention is disposed of by the court in *Maine* in the following language: 'We do not intend to suggest,

---

[11]*Smith* was cited with approval on this point in *Fain* v. *Superior Court, supra*, 2 Cal.3d at page 52, footnote 1.

however, that a large city may not also become so hostile to a defendant as to make a fair trial unlikely.'" (276 Cal.App.2d at p. 150, quoting from *Maine v. Superior Court, supra,* 68 Cal.2d at p. 387, fn. 13.)

The majority's apparent elevation of the population factor to preeminent status is all the more unfortunate in this case, because, unlike the *Manson* case[12] upon which the majority partially rely, the pervading publicity surrounding the crimes was limited to two counties at most. Thus, alternative forums for appellant's trial were readily available.

The majority also assert that the pretrial publicity in this case did not prejudice appellant at trial. They seek to prove this proposition by reference to the voir dire examination of the 12 jurors empanelled to try this case. This effort to establish a lack of prejudice is unpersuasive.

As this court has long recognized, the fact that "it was possible to select [jurors] who thought they could try the case fairly does *not* sustain the conclusion that a fair trial could be had." (*People v. McKay* (1951) 37 Cal.2d 792, 798 [236 P.2d 145], italics added.) Primary among the reasons for this rule are the difficulties inherent in identifying, uncovering, and preventing juror prejudice flowing from pretrial publicity.[13] Thus, jurors' declarations of impartiality are not dispositive. (*Sheppard v. Maxwell, supra,* 384 U.S. at p. 351 [16 L.Ed.2d at p. 613]; *People v. Tidwell, supra,* 3 Cal.3d at p. 73.)

The United States Supreme Court recently articulated alternative tests for determining when due process requires a conviction to be set aside on appeal as the result of pretrial publicity. (*Murphy v. Florida* (1975) 421 U.S. 794 [44 L.Ed.2d 589, 95 S.Ct. 2031].) Under these tests, the refusal to grant a motion for a change of venue will require reversal if, but only if, prejudice at trial is presumed, is inherent, or is inferrable.

Under the first test in *Murphy,* prejudice is "presumed" and a judgment of conviction must be reversed when "the influence of the news

---

[12]*People v. Manson* (1976) 61 Cal.App.3d 102 [132 Cal.Rptr. 265].

[13]See, inter alia, *Irvin v. Dowd, supra,* 366 U.S. at pages 727-728 [6 L.Ed.2d at pages 758-759]; *Sheppard v. Maxwell, supra,* 384 U.S. at page 362 [16 L.Ed.2d at page 620]; *Murphy v. Florida* (1975) 421 U.S. 794, 803 [44 L.Ed.2d 589, 596]; *Nebraska Press Assn. v. Stuart, supra,* 427 U.S. at pages 566-567 [427 U.S. at pages 701-702]; *Maine v. Superior Court, supra,* 68 Cal.2d at pages 380, 382-383; *People v. Tidwell, supra,* 3 Cal.3d at page 73; *Lansdown v. Superior Court, supra,* 10 Cal.App.3d at page 609; *Corona v. Superior Court, supra,* 24 Cal.App.3d at pages 878-879, 881.

media . . . in the community at large . . . pervaded the proceedings."[14] (*Id.*, at pp. 798-799 [44 L.Ed.2d at p. 594].) *Murphy* cited *Rideau* v. *Louisiana* (1963) 373 U.S. 723 [10 L.Ed.2d 663, 83 S.Ct. 1417] as a proper application of this "presumed prejudice" test. (See 421 U.S. at pp. 798-799 [44 L.Ed.2d at p. 593-594].) In *Rideau*, the defendant had confessed under police interrogation to the murder of which he stood convicted. A twenty-minute film of his confession was broadcast three times by one television station in the community where the crime and the trial took place. One of the broadcasts was viewed by an audience estimated to be about 50,000 persons in a community of 150,000.

Believing that the televised film "in a very real sense *was* Rideau's trial" to those who viewed it, the Supreme Court reversed the conviction "*without pausing to examine a particularized transcript of the voir dire examination of the members of the jury. . . .*" (*Rideau* v. *Louisiana, supra,* 373 U.S. at pp. 726, 727 [10 L.Ed.2d at pp. 665-666], initial italics in original, subsequent italics added.) The court held that "due process of law in this case required a trial before a jury drawn from a community of people who had not seen and heard Rideau's televised 'interview.'" (*Id.*, at p. 727 [10 L.Ed.2d at p. 666].)

In situations where prejudice is not "presumed," the *Murphy* court held that a "totality of circumstances" test should be applied. (421 U.S. at p. 799 [44 L.Ed.2d at p. 594].) Under this test, the appellate court determines whether either (1) "the jury-selection process . . . permits an inference of actual prejudice" or (2) "the setting of the trial was inherently prejudicial . . . ." (*Id.*, at p. 803 [44 L.Ed.2d at p. 597].) The court explained that even where no actual prejudice on the part of the trial jurors can be shown or inferred from the voir dire transcript, this factor "might be disregarded in a case where the general atmosphere in the community . . . is sufficiently inflammatory . . . ." (*Id.*, at p. 802 [44 L.Ed.2d at p. 596].)

The instant appeal undeniably involves one factor similar to that which invoked the "presumed prejudice" test in *Rideau*: a local television station broadcast a dramatic interview with appellant's father in

---

[14]According to the complete quotation from *Murphy*, prejudice is presumed in cases where "the influence of the news media, *either* in the community at large *or* in the courtroom itself, pervaded the proceedings." (Italics added.) Since this language is framed in the alternative and since there is no claim in the present case of overbearing press influence "in the courtroom itself," that portion of the quotation is deleted. (Cf., *Estes* v. *Texas, supra,* 381 U.S. 532; *Sheppard* v. *Maxwell, supra,* 384 U.S. 333.)

which the father tearfully revealed appellant's confession to him. While this interview was not broadcast three times as in *Rideau*, and did not portray appellant himself, nevertheless this publicity must at least be considered to have substantial impact under the "totality of circumstances" test. This impact would be especially relevant to the empanelled juror who admitted to viewing the broadcast.

In my view, appellant has more than met the "totality of circumstances" test. An examination of the jury-selection process as a whole—which *Murphy* requires, see 421 U.S. at page 803 [44 L.Ed.2d at page 596]—discloses that 90 percent of the prospective jurors had been exposed to pretrial publicity or discussions about the case.[15] Many jurors admitted they had felt horror or shock when the crime was disclosed in the press. And as one juror frankly admitted, it would take some "mind-rendering to erase maybe what I have felt." Indeed, one of the twelve jurors finally empanelled to try appellant's case stated "I imagine I did" form or express an opinion as to his guilt as a result of pretrial publicity. She stated, however, that she had no opinion "at this time" concerning guilt or innocence. She did not indicate what, if anything, had occurred to cause her to retreat from her initial opinion.

An especially disturbing aspect of the jury-selection process in this case was the report during voir dire of discussions by potential jurors in the jury lounge. According to the record, many people expressed the opinion that appellant was guilty. True, the trial judge did at one point call the jurors back into the courtroom specifically to admonish them against such conversations. However, such an admonishment is a double-edged sword. While it may deter future jury room discussions, the stern admonishment also reduces the likelihood that jurors, subject to voir dire thereafter, will admit to having heard or participated in these discussions.

In the final analysis, however, it is the inherently prejudicial setting of this case that tips the scales in favor of reversal. When the accused is portrayed as "sewage" polluting society, when the public is treated to

---

[15]This figure of 90 percent probably understates the actual proportion of such jurors. Courts have noted that jurors may not admit they have knowledge of pretrial publicity. (See, e.g., *Corona v. Superior Court, supra*, 24 Cal.App.3d at pp. 878-879.)

There is a strong indication that the jurors in this case were not immune from this tendency. According to a newspaper account of the preliminary voir dire of the first 12 jurors, when asked if they had read or heard about this case, "All 12 jurors raised their hands, some of them reluctantly and only after looking around to see the response of the others."

the sorry spectacle of prosecutorial offices publicly vying with each other to have "first crack" at convicting the accused, when the accused's prior homicide conviction becomes a routine part of the continuing press coverage of the case, when the state prison system is assailed for its "mistake" in releasing the accused and a public official admits the same, when the prior record of the accused's mother is deemed to be newsworthy, when a television station broadcasts the father's tearful recitation of his son's confession, then "the setting of the trial [is] inherently prejudicial." (See *Murphy* v. *Florida, supra*, 421 U.S. at p. 803 [44 L.Ed.2d at p. 597].)

Under the totality of the circumstances, this case should be reversed so that a fair trial may be conducted.

### III.

There are some particularly disturbing ramifications of the majority's holding in this case on the penalty phase decision of a capital trial.

The pretrial publicity in this case is important for another reason. The underlying but unmistakable message of the pretrial publicity as a whole was that the only appropriate punishment for appellant was death.[16] This leads to an important point.

At the penalty phase of a capital trial, the jury has the especially delicate task of deciding whether the accused should live or die. Jurors are called upon to "express the conscience of the community . . . ." (*Witherspoon* v. *Illinois* (1968) 391 U.S. 510, 519 [20 L.Ed.2d 776, 783 88 S.Ct. 1770].) It is undeniable that jurors making the penalty decision are entitled to, and in fact must of necessity, exercise considerably more subjective discretion in performing this task than they do in reaching a decision on guilt or innocence. (See *Adams* v. *Texas* (1980) 448 U.S. 38, 46 [65 L.Ed.2d 581, 590, 100 S.Ct. 2521].)

The conscience of the community is expressed by assuring that the pool from which penalty phase jurors is drawn accurately reflects the

---

[16]The message comes through in this fashion: appellant has killed before, yet he was released from prison into society by blundering or incompetent prison officials; he has killed again, thus proving he will forever be dangerous and is no more than refuse in our community; the only way to prevent a second mistaken release and yet another tragic killing is to take the matter away from the control of the prison officials; this can be done only by executing the appellant.

community as a whole. In this way, the discretion exercised by those jurors will, in the long run, closely approximate that which would be exercised by the community as a whole. (Cf., generally, *Hovey* v. *Superior Court* (1980) 28 Cal.3d 1, 73-74 [168 Cal.Rptr. 128, 616 P.2d 1301].)

However, when a case produces a great deal of potentially prejudicial publicity, certain members of the community become ineligible to serve at the trial as a consequence of that publicity. They are removed from the pool of persons from which, inter alia, the penalty phase jury is drawn. Certain types of individuals tend to be removed from the pool as a result of pretrial publicity. It has been suggested that an "honest juror" will frequently find himself excluded. (See *Corona* v. *Superior Court, supra*, 24 Cal.App.3d at p. 879.) One might further speculate that the "self-aware" juror may also tend to be excluded. But one type of juror will, almost by definition, tend to be removed in disproportionate numbers from the jury pool: the jurors who are informed and knowledgeable about current affairs.

Whatever the impact of the removal of these jurors upon the guilt determination, the impact on the penalty phase is likely to be devastating. At that phase, where jurors are given the most discretion and where the jury verdicts are supposed to express that undefinable quality known as the conscience of the community, the law removes from the jury those who are most informed about the community. Since extensive publicity tends to occur in connection with important cases, this removes these individuals in the very cases which are most significant.

There is no failsafe "solution" to this irony. However, a frank recognition of its existence would lead us to consider ways of mitigating its effect where possible. Such mitigation is readily available in capital cases like the present one, since intensive pretrial publicity was confined to a few counties in the state.

A change of venue to another county would have substantially restored the jury pool in this case to that which is available in a case of less notoriety. A change of venue would have made it possible for this court to feel more secure that the verdict expressed in this case truly reflected the conscience of our California community.

## IV.

Before the state can put to death one of its citizens, the accused must be found guilty after a fair trial by a jury selected from a cross-section of the community. In this case, appellant received neither. Under our case law, if a fair trial has been denied, the conviction must be reversed regardless of the evidence of the accused's guilt. (*Irvin* v. *Dowd, supra*, 366 U.S. at p. 722 [6 L.Ed.2d at p. 755]; *People* v. *Tidwell, supra*, 3 Cal.3d at p. 76; *Maine* v. *Superior Court, supra*, 68 Cal.2d at p. 384; *People* v. *McKay, supra*, 37 Cal.2d at pp. 798, 800.)

As this court explained more than a century ago, "The prisoner, whether guilty or not, is unquestionably entitled by the law of the land to have a fair and impartial trial. Unless this result be attained, one of the most important purposes for which Government is organized and Courts of Justice established will have definitively failed. Cases sometimes occur, and this would appear to be one of them, in which the very enormity of the offense itself arouses the honest indignation of the community to such a degree as to make it apparent that a dispassionate investigation of the case cannot be had. Under such circumstances the law requires that the place of trial be changed." (*People* v. *Yoakum* (1879) 53 Cal. 566, 571.)

Mosk, J., concurred.

Appellant's petition for a rehearing was denied March 20, 1981. Bird, C. J., and Mosk, J., were of the opinion that the petition should be granted.