Filed 2/8/16  P. v. Campos CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H040698 |
| Plaintiff and Respondent, | (Monterey County |
| | Super. Ct. No. SS130605) |
| v. | |
| JOSE HERNANDEZ CAMPOS, | |
| Defendant and Appellant. | |

## I.     INTRODUCTION

In a first jury trial that ended in June of 2013, defendant Jose Hernandez Campos was found guilty of two charges:  inflicting corporal injury on a spouse or cohabitant (Pen. Code, § 273.5, subd. (a))[1] and misdemeanor vandalism (§ 594, subd. (b)(2)(A)).  The jury found defendant not guilty of three charges:  attempted murder (§§ 664/187, subd. (a)), kidnapping for rape (§ 209, subd. (b)(1)), and dissuading a witness by force or threat (§ 136.1, subd. (c)(1)).  The jury was unable to reach verdicts as to four charges:  forcible rape (§ 261, subd. (a)(2)), criminal threats (§ 422, subd. (a)), false imprisonment by violence (§ 237, subd. (a)), and dissuading a witness (§ 136.1, subd. (b)(1)).  The trial court declared a mistrial as to the latter four counts.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

In a second jury trial that ended in December of 2013, defendant was found guilty of the four offenses as to which the prior jury could not reach a verdict: forcible rape (§ 261, subd. (a)(2)), criminal threats (§ 422, subd. (a)), false imprisonment by violence (§ 237, subd. (a)), and dissuading a witness (§ 136.1, subd. (b)(1)). At defendant's sentencing hearing, the trial court imposed a nine-year prison term.

On appeal, defendant challenges his four convictions at the second trial. He contends the trial court erred by: (1) informing the jury about the other five charges; (2) removing a juror during deliberations; and (3) conducting an inquiry into juror misconduct that intruded on the sanctity of the jury's deliberations. For reasons that we will explain, we will affirm the judgment.

## II.  BACKGROUND

### A.  *Testimony of Jane Doe*

Jane Doe and defendant met in 2002 or 2003, when they were living in the same apartment complex. Doe was in middle school at the time. At some point, Doe and defendant began a sexual relationship. In 2004, when Doe was 15 years old and defendant was 21 or 22 years old, they had a child together. They were living together and considered themselves married, even though they had not been legally married. In 2007, just before Doe turned 18, Doe and defendant had another child together.

In 2009 or 2010, Doe moved out of the residence she had been sharing with defendant and their two children. According to Doe, they were having "problems" due to defendant's unfounded jealousy. They subsequently "got back together," although Doe left defendant on one other occasion. After getting back together, their relationship included a lot of yelling and verbal arguments, but no physical violence.

In April of 2011, Doe and defendant agreed to custody orders, which provided that defendant would have custody of the children and that Doe would visit with the children once every 15 days. However, Doe continued to live with defendant and the children

2

until February of 2012, when defendant told her to leave. Doe moved in with her parents, who lived about two blocks away; the children stayed with defendant. Defendant would call Doe at all hours after she moved out, and she eventually changed her cell phone number. Defendant would also interfere with Doe's visitation. Once or twice, defendant said he would allow Doe to see the children only if she had sex with him, so she did. At some point, defendant told Doe that he was going to try to prevent her from seeing the children, and he brought a motion in court to preclude Doe from having any visitation. A court date was set for July 26, 2012.

On July 8, 2012, Doe picked up the children and spent the day with them. Doe brought the children back to defendant's house at night with the expectation of picking them up again in the morning.

When Doe went to defendant's residence the next morning, defendant answered the door. The children were not there.[2] Defendant grabbed Doe by the arm, pulled her inside, and hit her in the face with his fist, causing her to fall to the floor. Defendant told Doe that he was going to kill her. Defendant indicated he was angry because Doe was involved with another person and their children would be around that person.

Defendant dragged Doe to the kitchen, got on top of her, and began hitting her in the face with closed fists, repeating that he was going to kill her. Defendant then got a knife and put it to Doe's throat, again saying he was going to kill her. Defendant then released the knife and tried to strangle Doe. He put both of his hands on her neck and squeezed. Doe began to feel that she could not get enough air, and her body felt weak.

While defendant's hands were around Doe's throat, Doe's cell phone rang. Defendant released Doe's neck, grabbed her cell phone, and threw it. Defendant then picked Doe up and brought her into the living room and then into his bedroom, while

---

[2] Defendant's mother testified that defendant had asked her to take the children earlier that morning.

3

again holding the knife to her neck.  Defendant threw Doe onto the bed and took her clothes off, despite Doe telling him not to.  Defendant then had sex with her.  Afterwards, Doe tried to talk defendant into letting her go by promising that they could be together again and that she would not tell anyone what had just happened.  Defendant told Doe not to report him to the police.  Eventually, at about 2:00 p.m., defendant allowed Doe to leave.

Doe went home, spoke with her parents, and then flagged down a police officer who was on patrol.  She told the officer what happened and then went to the hospital.  Doe attended the court hearing on July 26, 2012, told the judge what had happened, and obtained legal custody of the children.  She subsequently applied for and obtained a U visa, based on her status as a victim of domestic violence.[3]

### B.	Investigation

The officer that Doe contacted was former Soledad Police Officer Zachariah Swift.[4]  Doe told Officer Swift that her boyfriend had just battered her, raped her, and held her against her will for five hours.  Officer Swift observed visible injuries on Doe's face, including welts on her forehead, redness on the side of her face, and scratches on her neck.

Officer Swift took Doe back to the police station so he could interview her in private.  Doe told him that she had gone to defendant's house to get her children, that defendant had grabbed her and pulled her into his residence, that he had struck her in the face and knocked her to the floor, that he had straddled her and hit her two more times, that he had squeezed her neck, and that he had repeatedly said he was going to kill her.

---

[3] Pursuant to title 8 of the Code of Federal Regulations, section 214.14, "An alien is eligible for U-1 nonimmigrant status" if he or she "has suffered substantial physical or mental abuse" as a result of having been a victim of domestic violence.

[4] At the time of trial, Officer Swift was working for the Monterey County Sheriff's Department.

Doe said that defendant had released his grip about the time her cell phone rang, that defendant had broken her cell phone and thrown it, and that defendant had put a knife to her neck and again threatened to kill her. Doe reported that defendant had dragged her to the bedroom, removed her clothing, and had intercourse with her against her will. Defendant had then kept her in his residence for several hours, trying to reconcile with her, until she convinced him that she would come back.

Defendant was taken into custody, and police searched his residence. The knife was recovered from a dish drainer, and Doe's broken cell phone was found under a couch.

Doe underwent a sexual assault exam. She gave an account of the assault that was consistent with what she had told Officer Swift. Doe had bruises on her chest and "a lot of bruising and a lot of injuries to her face." Doe had petechiae, which can be caused by strangling, over her eyes and over her cheekbones. She had a bruise on her arm and scratches on her shoulder. She had no vaginal injuries, but the sexual assault nurse who examined Doe testified that such injuries are rarely seen in sexual assault exams. The nurse believed Doe's injuries were consistent with a sexual assault.

At the hospital, following her exam, Doe was interviewed by City of Soledad Police Detective Jorge Arreola. Doe's description of the incident was consistent with what she had told Officer Swift and what she had told the sexual assault exam nurse, except that she told Detective Arreola that defendant had raped her "three different times," all in the bedroom. Detective Arreola later clarified that Doe had provided this information after he told her that defendant said they had had sex three times, in response to his question about how many times defendant had sexually assaulted her.

Defendant called Doe from jail after his arrest, and he spoke to Doe's mother. Defendant indicated that he might be sent to Mexico or sentenced to prison, and that if so, he would not be able to provide for the children. He suggested that Doe drop the charges

5

and claimed that "there are some that are not true." He admitted that he "did mess up" and that he had "beat her up hard," but he claimed that Doe had forgiven him.

### C.     *Defense Witnesses*

Defendant's sister, Erica Hernandez, testified that she had sat through defendant's first trial and then decided to come forward, because in several respects, Doe's testimony had been inconsistent with what she had previously told Hernandez. First, Doe had testified that she had walked home from defendant's residence after the incident, but she had told Hernandez that she "had gone dragging home" and did not know how she got home. Second, Doe had testified that defendant kept her in the living room after the assault, but she had told Hernandez that defendant had told her to leave and that she had refused to leave without "settl[ing] matters with him." Third, Doe had testified that she went out and found a police officer, but she had told Hernandez that a police officer had "seen her at her apartment where she lives." Doe also mentioned to Hernandez that she and defendant were supposed to go to court later that week, but that since defendant would be in jail, the court would award custody to Doe.

Defendant testified that on the morning of the incident, he had gone to work from 6:00 a.m. to 8:30 a.m. On the way home from work, defendant bought some beer, and he drank one beer before Doe arrived at his house. The night before, he had consumed alcohol and taken methamphetamine.

Defendant acknowledged that he did not want Doe to take the children that day. He was "bother[ed]" by the fact that Doe had told him she was going out with someone the previous night, but he did not plan to commit any violence against Doe.

Defendant also acknowledged that the children were with his mother when Doe knocked on his door. He did not want the children to be around Doe's new partner.

According to defendant, when Doe knocked on his door and asked for the children, defendant told her, "[D]on't take them." Doe told defendant that he was not "going to decide what she was going to do with her life" and laughed. Defendant became

6

angry, and he slapped her. Defendant then grabbed and pulled Doe, telling her to "keep away" from the children, and he punched or slapped her two times. Doe fell to the floor, and defendant got on top of her. Defendant grabbed Doe around the neck, but he let her go when she began to cry. Defendant denied putting a knife to Doe's neck, but he admitted grabbing her cell phone and throwing it to the ground.

Defendant testified that after he let go of Doe's neck, Doe stood up. Defendant hugged Doe and asked her to forgive him, and Doe asked defendant to forgive her. Doe said she loved him and they kissed. Defendant admitted grabbing a knife from the kitchen at that point, but he could not explain why he did so. Defendant admitted holding the knife while telling Doe that he "could have killed her," but he denied saying that he "was going to kill her."

According to defendant, he and Doe talked in the living room for "a while." Doe took off her sweatshirt because she was hot, and she had only a bra underneath. They kissed and defendant indicated he wanted to have sex. Doe took his hand and walked to the bedroom. Defendant put the knife back into the kitchen before proceeding to the bedroom. He helped Doe remove her clothes, and they then engaged in consensual sex. Afterwards, they went into the living room, but they returned to the bedroom and had sex two more times.

Defendant testified that after he and Doe had sex, Doe said that they were going to get back together. Defendant told Doe that she could leave and call the police, since he had hit her. Doe told him no and that she loved him. She told defendant to go to sleep, then shower, and then go get their children, and he agreed. Defendant told Doe to wait a while before leaving, because of the marks on her face. Doe applied some makeup to her face to cover the marks, then left, briefly returning to give him a kiss.

On cross-examination, defendant acknowledged that at his first trial, he had admitted to punching Doe with closed fists. Also during cross-examination, the

prosecutor began asking defendant about his police interview, but the trial court sustained a defense objection, and no further testimony was elicited on that topic.[5]

### D. Procedural Background

Defendant was charged with willful, deliberate, and premeditated attempted murder (count 1; §§ 664/187, subd. (a)), kidnapping for rape (count 2; § 209, subd. (b)(1)), forcible rape (count 3; § 261, subd. (a)(2)), criminal threats (count 4; § 422, subd. (a)), dissuading a witness by force or threat (count 5; § 136.1, subd. (c)(1)), inflicting corporal injury on a spouse or cohabitant (count 6; § 273.5, subd. (a)), false imprisonment by violence (count 7; § 237, subd. (a)), misdemeanor vandalism (count 8; § 594, subd. (b)(2)(A)), and dissuading a witness from reporting a crime (count 9; § 136.1, subd. (b)(1)).

As to count 2 (kidnapping for rape) and count 3 (forcible rape), the information alleged that defendant used a deadly or dangerous weapon (§ 12022, subd. (b)), and that defendant kidnapped the victim (§ 667.61, subd. (d)(2)). As to count 3 (forcible rape), the information also alleged another deadly or dangerous weapon use allegation. (§ 667.61, subd. (e)(3).)

In a first jury trial that ended in June of 2013, defendant was found guilty of two charges: inflicting corporal injury on a spouse or cohabitant (count 6; § 273.5, subd. (a)) and misdemeanor vandalism (count 8; § 594, subd. (b)(2)(A)). The jury found defendant not guilty of three charges: attempted murder (count 1; §§ 664/187, subd. (a)), kidnapping for rape (count 2; § 209, subd. (b)(1)), and dissuading a witness by force or threat (count 5; § 136.1, subd. (c)(1)). The jury was unable to reach verdicts as to four charges: forcible rape (count 3; § 261, subd. (a)(2)), criminal threats (count 4; § 422, subd. (a)), false imprisonment by violence (count 7; § 237, subd. (a)), and dissuading a

---

[5] At a sidebar, the trial court found that defendant's police interview was inadmissible because of "a defective Miranda warning." (See *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).)

witness from reporting a crime (count 9; § 136.1, subd. (b)(1)). The trial court declared a mistrial as to the latter four counts.

In a second jury trial that ended in December of 2013, defendant was found guilty of the four offenses as to which the prior jury could not reach a verdict: forcible rape (count 3; § 261, subd. (a)(2)), criminal threats (count 4; § 422, subd. (a)), false imprisonment by violence (count 7; § 237, subd. (a)), and dissuading a witness (count 9; § 136.1, subd. (b)(1)). As to the rape, the jury found not true the allegations that defendant used a deadly weapon (§§ 667.61, subd. (e)(3), 12022, subd. (b)) and kidnapped the victim (§ 667.61, subd. (d)(2)).

At the sentencing hearing held on February 6, 2014, the trial court imposed a nine-year prison term. It imposed the six-year middle term for count 3 (forcible rape), a consecutive two-year term for count 9 (dissuading a witness), a consecutive one-year term for count 6 (inflicting corporal injury on a spouse or cohabitant), concurrent two-year terms for count 4 (criminal threats) and count 7 (false imprisonment by violence), and a 664-day jail term for count 8 (misdemeanor vandalism).

### III. DISCUSSION

#### A. *Jury Instruction Regarding Other Charges*

Defendant contends the trial court erred by informing the jury at his second trial about the five charges resolved at the first trial. The trial court instructed the jury pursuant to CALCRIM No. 205 as follows: "Counts 1, 2, 5, 6 and 8 charging the defendant with attempted murder in Count 1. Aggravated kidnapping for the purpose of committing rape, Count 2, [Count] 5, dissuading a witness by force or threat, Count 6, inflicting corporal injury on a spouse or cohabitant, and Count 8, vandalism, no longer need to be decided in this case. Do not speculate about or consider in any way why you no longer need to decide these counts." The trial court further instructed the jury, "Do

9

not consider the fact that there was another trial before this trial or speculate as to what happened in that trial."

Defendant contends the above instruction should not have been given because it "only served to give the jurors information that was irrelevant and highly prejudicial to [defendant's] case." Defendant points out that, according to the bench notes for CALCRIM No. 205, the instruction is intended to be given "if one or more of the original counts has been removed from the case, whether through plea or dismissal," and that counts 1, 2, 5, 6, and 8 were never before the jury at the second trial.

The Attorney General contends that defendant forfeited his challenge to the instruction by failing to object at trial, citing *People v. Hudson* (2006) 38 Cal.4th 1002 (*Hudson*) for the proposition that when an instruction is " 'correct in law and responsive to the evidence,' " an objection is required in order to preserve a challenge to that instruction on appeal. (*Id.* at p. 1012.) The Attorney General notes that defendant affirmatively indicated he had no objections to the instructions given.

Defendant contends we should reach the merits of his claim. He first argues that the instruction was *not* " 'responsive to the evidence' " (*Hudson, supra,* 38 Cal.4th at p. 1012) because the jury had not been previously told of the other five charges. We disagree. During the second trial, the jury repeatedly heard that there had been a first trial. The first trial was mentioned at numerous times during the testimony of various witnesses, including during the defense's cross-examination of Doe the defense's direct examination of defendant's sister, and the prosecution's cross-examination of defendant. In addition, the original numbering of the charges was maintained at the second trial, so the jury knew that it was considering only counts 3, 4, 7, and 9. On this record, we agree with the Attorney General that the challenged instruction was " 'responsive to the evidence.' " (*Ibid*.)

Defendant next contends that no objection was required in order to challenge the instruction on appeal because, by "bringing irrelevant *facts* to the jury's attention," the

10

instruction affected his substantial rights. (See § 1259; *People v. Johnson* (2015) 60 Cal.4th 966, 993.) We will assume the instruction did affect defendant's substantial rights. (See *People v. Harris* (1981) 28 Cal.3d 935, 956 [instruction on evidence of uncharged crimes affected defendant's substantial rights].) In considering the merits of defendant's claim that the trial court should not have given the challenged instruction, we apply an independent standard of review. (See *People v. Waidla* (2000) 22 Cal.4th 690, 733.)

Defendant contends the instruction regarding counts 1, 2, 5, 6, and 8 was erroneous because it alerted the jurors to "the existence of charges that they would otherwise have known nothing about, and likely stimulated a curiosity that they would not otherwise have had." As discussed above, however, the jury had already learned that there had been a first trial in this case and that the jury was considering only counts 3, 4, 7, and 9. Although the jury had not learned the specific crimes that had previously been charged, the evidence adduced at the second trial "naturally supported" those other charges, as the Attorney General asserts. For instance, the jury in the second trial heard evidence that would logically lead to an attempted murder charge: defendant had choked Doe until she could not breathe, and he had stopped only when interrupted by her cell phone ringing. Likewise, the jury heard evidence that would logically lead to a kidnapping for rape charge: defendant had carried Doe into his bedroom, while holding a knife to her neck, then raped her. Thus, even before the challenged instruction, the jurors were likely to have been curious about why defendant was not facing additional charges and about the status of counts 1, 2, 5, 6, and 8.

Defendant next claims that the trial court should have informed the jury that defendant had been acquitted of the attempted murder and the kidnapping for rape, which he classifies as the two most serious charges. Defendant relies on *People v. Mullens* (2004) 119 Cal.App.4th 648 (*Mullens*), which held "that if a trial court permits the prosecution to present evidence that the defendant committed one or more similar

11

offenses for which he or she is not charged in the current prosecution, the trial court must also allow the defense to present evidence of the defendant's acquittal, if any, of such crimes." (*Id.* at pp. 664-665.) Here, however, defendant did not seek to introduce evidence of his acquittals at the first trial. While *Mullens* instructs that a trial court must allow the defense to introduce evidence of acquittals, it does not impose a sua sponte instructional obligation on the trial court to inform the jury of those acquittals.

Defendant next contends that the jury could not be expected to follow the instruction to the extent it told the jury not to "speculate about or consider in any way" why counts 1, 2, 5, 6, and 8 were no longer at issue. Defendant relies on several cases in which evidence of prior charges or convictions was found prejudicial despite an instruction telling the jury to disregard that evidence. (See *People v. Allen* (1978) 77 Cal.App.3d 924, 935 [evidence that defendant was on parole was not harmless in an "extremely close case" in which the defendant's credibility was a significant factor]; *People v. Ozuna* (1963) 213 Cal.App.2d 338, 342 [jurors could not have "put out of their minds" the defendant's own statement about being a convict]; *People v. Roof* (1963) 216 Cal.App.2d 222, 226 [effect of hearing defendant's statement about having been charged with another offense "could not have been undone" by jury admonition].) However, our Supreme Court has more recently stated that we must presume a jury followed a limiting instruction given as to "other crimes" evidence (e.g., *People v. Lindberg* (2008) 45 Cal.4th 1, 26 (*Lindberg*)) and that evidence of prior arrests and convictions is not necessarily "so prejudicial that its admission must always result in reversal of the judgment" (*People v. Jennings* (1991) 53 Cal.3d 334, 375). Here, defendant does not contend that the jury should not have heard the *evidence* underlying counts 1, 2, 5, 6, and 8, but only that the jury should not have heard that certain *charges* had been filed. The mere fact of the prior *charges* was not so inherently prejudicial that the jury could not be expected to follow the trial court's express admonition to not speculate about why those charges were not at issue.

12

Finally, we do not agree with defendant that the challenged instruction could have encouraged the jury to speculate that counts 1, 2, 5, 6, and 8 occurred on a different occasion or involved a separate victim. As previously noted, the evidence adduced at the second trial logically supported the charges in counts 1, 2, 5, 6, and 8, and the jury was informed that it was considering only counts 3, 4, 7, and 9. Moreover, as already noted, the jury was expressly instructed *not* to speculate about the five other counts, and we must presume the jury was able to follow that admonition. (See *Lindberg, supra,* 45 Cal.4th at p. 26.)

In sum, we conclude the trial court did not err by instructing the jury about the five charges resolved at the first trial.

## B. *Removal of Juror*

Defendant contends the trial court erred by removing a juror during deliberations.

### 1. **Jury Note and Inquiry**

The jury retired to deliberate at 3:44 p.m. on December 12, 2013 and deliberated all day on December 13, 2013. On the third day of deliberations, December 16, 2013, the jury submitted three notes to the trial court. One note concerned one of the enhancement allegations. Another note indicated that the jury had reached verdicts as to count 7 (false imprisonment by violence) and count 9 (dissuading a witness from reporting a crime) but that it could not decide on count 3 (forcible rape) or count 4 (criminal threats). The third note read, "We have concerns about the integrity of one of our jurors and the ability of that juror to follow [the] judge[']s instructions."

The trial court brought the jury into court and asked for further information about the juror who was "having difficulty following the law." Juror No. 7, who had written the note, indicated that two of the jurors felt that one of the jurors—later identified as Juror No. 8—"had an opinion before entering deliberations and refused to listen to the evidence and change it after that." Juror No. 7 also asserted that Juror No. 8 had "tried to

13

bring things into the deliberations that [the trial court] specifically told us not to," such as why "other counts" were not "brought up."

The trial court asked whether Juror No. 8 had made "a pronouncement at the beginning of the deliberations about their views on the case." Juror No. 7 replied, "Yes." The trial court asked for any other indications that Juror No. 8 was not following the instructions. Juror No. 7 reported that Juror No. 8 had brought up "something personal" as "the reason why he had decided the case."

Juror No. 4 explained that Juror No. 8 had "brought in past experiences with his profession that have led to evidence that we haven't heard or why [the trial court] wouldn't let certain testimony come in or things like that." Juror No. 4 noted that the jury had been "told to disregard anything that [the trial court] did as being for one side or the other," but that Juror No. 8 had "refused to do that." The trial court asked, "What was it that he brought into --[?]" Juror No. 4 referenced the prosecutor's interrupted questioning about defendant's statement to the police. According to Juror No. 4, Juror No. 8 had offered the other jurors an explanation for why they never heard more about defendant's statement to the police, telling them that it was "probably . . . because the police had made a mistake somewhere and [defendant] was not Mirandized." Several other jurors had reminded Juror No. 8 that they "weren't allowed to consider that," but Juror No. 8 had responded that "that was his life experience and that he could bring that in." Juror No. 4 further reported that when the jury was discussing certain counts, Juror No. 8 had argued, "that's a different charge, that's a different crime."

The trial court asked if Juror No. 7 had anything to add about Juror No. 8 bringing up topics "outside of the evidence." Juror No. 7 stated that although the jury had been told specifically not to consider why defendant "wasn't being brought up on domestic violence and other charges," Juror No. 8 "kept wanting to bring that into evidence during deliberations" and suggested that if defendant "wasn't charged with that, then he must be innocent of all the other stuff too."

14

The trial court excused all of the jurors except for Juror No. 8. The trial court asked Juror No. 8 if he wished to say anything. Juror No. 8 responded that the other jurors had tended to "focus on the violence as essentially a crime," and that he had been "kind of amazed" that defendant was not facing an assault and battery charge "or anything like that," so he had commented that possibly that crime had been decided in the first trial or that the prosecutor had not charged it for tactical reasons.

The trial court stated that it did not want to "get too deeply into the deliberations" and asked whether Juror No. 8 had brought in "the things they say you brought in." Juror No. 8 responded that he had not brought in anything from his "legal experience" and referenced the prosecutor's interrupted cross-examination regarding defendant's statement to the police. The trial court asked if Juror No. 8 had brought up "Miranda at that time." Juror No. 8 admitted, "I did."

Juror No. 8 denied saying that he had made up his mind "ahead of time" and denied that he had indicated "a prejudice" during deliberations. The trial court asked if Juror No. 8 if he had anything else to add, reminding Juror No. 8 that the trial court wanted to "avoid getting into the deliberations of the jury." Juror No. 8 responded that "there was a difficulty separating the charges which were brought as opposed to the ones that weren't brought." Juror No. 8 also admitted that he had, as alleged, told the other jurors about "something personally that happened to [him]" concerning "the way human beings react to essentially a high trauma between people that like each other."

The prosecutor asked for clarification of whether Juror No. 8 had "decided to vote a particular way based on his personal experience without the consideration of the evidence." Juror No. 8 replied that he had "[a]bsolutely not" done so.

### 2. Arguments, Ruling, and Motion for New Trial

After the jury left the courtroom, the prosecutor argued that Juror No. 8's comments showed that he had been "using his knowledge of the law in a way which is

15

not before the jury" and "using his personal information." The prosecutor asked the trial court to discharge Juror No. 8.

Defendant's trial counsel opposed Juror No. 8's discharge. He asserted that the trial court had "delved too far . . . into the jury deliberations and some of the thought processes." He requested the trial court declare a mistrial.

The trial court denied the defense motion for a mistrial and removed Juror No. 8. The trial court noted that Juror No. 8 had admitted bringing up "his own views" about why certain evidence did not come in and had brought up "the Miranda issue" with the other jurors, in violation of the court's admonition "not to discuss things that are not part of the record."

When the jurors returned to the courtroom, the trial court asked the jury if any other juror had "discussed personal experiences in the course of [the] deliberations." Several jurors replied, "No." The trial court also asked whether any other juror felt "prejudiced for one side or the other as a result of any extraneous matters that the excused juror brought up during the course of deliberations." None of the jurors responded. The trial court then substituted an alternate juror for Juror No. 8 and instructed the jury to begin deliberations anew. About two hours and 20 minutes later, the jury returned with its verdicts, finding defendant guilty of all four counts.

Defendant subsequently filed a motion for a new trial, raising several issues, including the discharge of Juror No. 8. Defendant argued that there had not been a showing that Juror No. 8 committed prejudicial misconduct or was unable to participate in the deliberations. The prosecution filed opposition to defendant's motion for a new trial, arguing, inter alia, that the trial court had properly discharged Juror No. 8 because the juror had engaged in "multiple acts of misconduct."

At the sentencing hearing held on February 6, 2014, the trial court denied defendant's motion for a new trial. As to the juror removal issue, the trial court reiterated its finding that Juror No. 8 had committed misconduct: "It wasn't just bringing up the

16

personal experiences, but he admitted that he brought up the Miranda issue. . . . [¶] He was a practicing attorney. And he, of all people, should have known not to ignore the court instructions about not to speculate about why things were not ruled in. He brought up his legal opinion. And his opinion may have been expressed as a juror. But with his background, it was clearly misconduct on his part."

### 3. Analysis

The trial court may discharge a juror at any time, upon "good cause shown to the court," if the juror "is found to be unable to perform his or her duty." (§ 1089; see *People v. Lomax* (2010) 49 Cal.4th 530, 588 (*Lomax*).) "[A] juror is required to apply the law as instructed by the court, and refusal to do so *during deliberations* may constitute a ground for discharge of the juror. [Citation.]" (*People v. Engelman* (2002) 28 Cal.4th 436, 443.)

" 'In determining whether juror misconduct occurred, "[w]e accept the trial court's credibility determinations and findings on questions of historical fact if supported by substantial evidence." ' [Citations.]" (*People v. Linton* (2013) 56 Cal.4th 1146, 1194 (*Linton*).) The ultimate decision to discharge a juror is a matter within the trial court's discretion. (*Lomax, supra,* 49 Cal.4th at p. 589.) However, " 'a somewhat stronger showing' than is typical for abuse of discretion review must be made to support such decisions on appeal. [Citation.]" (*Ibid*.) "[T]he basis for a juror's disqualification must appear on the record as a 'demonstrable reality.' This standard involves 'a more comprehensive and less deferential review' than simply determining whether any substantial evidence in the record supports the trial court's decision. [Citation.] It must appear 'that the court as trier of fact *did* rely on evidence that, in light of the entire record, supports its conclusion that bias was established.' [Citation.] However, in applying the demonstrable reality test, we do not reweigh the evidence. [Citation.] The inquiry is whether 'the trial court's conclusion is manifestly supported by evidence on which the court actually relied.' [Citation.]" (*Id.* at pp. 589-590, fn. omitted.)

17

Defendant acknowledges that Juror No. 8 violated the trial court's instructions not to "guess" why the trial court made any ruling, by mentioning that defendant's statement to the police might have been excluded because of a *Miranda* violation. (See CALCRIM Nos. 104, 222.) However, he argues that Juror No. 8's misconduct was merely a "technical violation" of the instructions and not so serious as to justify his discharge. Defendant points out that Juror No. 8 apparently did not speculate as to what defendant might have said in his police statement nor indicate that the jury should resolve the case a particular way because of the *Miranda* violation.

Defendant relies on two cases for the proposition that Juror No. 8's misconduct was too trivial to justify that juror's removal. Both cases, *People v. Wilson* (2008) 44 Cal.4th 758 (*Wilson*) and *Linton, supra,* 56 Cal.4th 1146, were death penalty cases that involved alleged violations of the admonition not to speak to anyone connected with the case. In *Wilson*, a juror made comments during a break in the guilt phase indicating he believed the defendant's actions were partially attributable to the lack of a father or other authority figure. (*Wilson, supra,* at pp. 836-837.) The California Supreme Court held that the juror's comments were merely "technical" and "trivial" violations of the trial court's admonitions, noting that they were comprised of "one, possibly two sentences, spoken in rhetorical fashion and not in an obvious attempt to persuade anyone." (*Id.* at pp. 839-840.) In *Linton,* a juror violated the trial court's admonitions by speaking to her husband about the case, but she did not disclose to him any specific facts, and her husband did not respond with any feedback or comments. The California Supreme Court upheld the trial court's finding that the juror did not commit misconduct. (*Linton, supra,* 56 Cal.4th at p. 1195.)

The instant case does not involve an alleged violation of the admonition not to speak to anyone connected with the case. Here, the jury misconduct involved violations of the trial court's admonitions not to "guess" why the trial court made certain evidentiary rulings, to "use only the evidence that is presented in the courtroom," not

18

to use "sources of information outside of the evidence and law given to you in this case in any way," not to "speculate about or consider in any way" why the jury did not need to decide counts 1, 2, 5, 6, and 8, and not to "consider the fact that there was another trial before this trial or speculate as to what happened in that trial." Specifically, Juror No. 8—a practicing attorney with special legal knowledge—told the other jurors that the trial court probably excluded defendant's statement to the police because of a *Miranda* violation, and he told the other jurors possible reasons why the jury was not asked to consider charges such as assault or battery, suggesting that such charges might have been decided in the first trial or that the prosecutor might have had a tactical reason for not including such charges.

" 'Jurors cannot be expected to shed their backgrounds and experiences at the door of the deliberation room.' " (*People v. Allen and Johnson* (2011) 53 Cal.4th 60, 76 (*Allen*).) " 'Jurors' views of the evidence . . . are necessarily informed by their life experiences, including their education and professional work. A juror, however, should not discuss an opinion explicitly based on specialized information obtained from outside sources. Such injection of external information in the form of a juror's own claim to expertise or specialized knowledge of a matter at issue is misconduct. [Citations.]' " (*Ibid.*)

The California Supreme Court held that a person with specialized legal knowledge commits misconduct by bringing that knowledge into deliberations. While in general a juror does not commit misconduct by making "a general statement about the law that finds its source in everyday life and experience," a juror with specialized legal knowledge does commit misconduct by telling other jurors about "*extraneous* law, i.e., law not given to the jury in the instructions of the court [citation]." (*People v. Marshall* (1990) 50 Cal.3d 907, 950, 949 [juror with law enforcement background committed misconduct by telling other jurors that juvenile records are sealed]; see also *In re Stankewitz* (1985) 40 Cal.3d 391, 396, 400 [juror committed "overt misconduct" by telling the other jurors that

19

he had been a police officer and that he knew the law of robbery, which was at issue in the case].)

In this case, the record supports a finding that Juror No. 8 injected his specialized legal knowledge into the deliberations in violation of the trial court's admonitions. Moreover, the record supports a finding that Juror No. 8's misconduct was not merely a "technical violation" of the trial court's instructions (*Wilson, supra,* at p. 839) but rather misconduct serious enough to justify Juror No. 8's discharge. The trial court had specifically instructed the jury not to guess about the reason why certain rulings were made and not to speculate about what happened at the first trial or why it did not need to decide counts 1, 2, 5, 6, and 8. Juror No. 8 not only speculated about those matters, but he shared his educated guesses about those matters with the other jurors. Further, his improper comments were "the type of information that was inherently likely to influence the jurors." (*People v. Thomas* (2012) 53 Cal.4th 771, 819.) According to Juror No. 7, Juror No. 8 explicitly suggested that if defendant was not charged with certain other offenses "then he must be innocent of all the other stuff too."

In sum, the basis for Juror No. 8's disqualification appears on the record "as a 'demonstrable reality.' " (*Lomax, supra,* 49 Cal.4th at p. 589.) The trial court therefore did not abuse its discretion by discharging Juror No. 8.

### C. *Juror Misconduct Inquiry*

Defendant contends the trial court's inquiry into juror misconduct intruded on the sanctity of the jury's deliberations because the trial court asked the jurors, after removing Juror No. 8, whether any of them had "discussed personal experiences" during deliberations. Defendant argues that the trial court's question erroneously suggested that it would be misconduct for a juror to discuss personal experiences during deliberations when in fact, " '[j]urors cannot be expected to shed their backgrounds and experiences at the door of the deliberation room.' " (*Allen, supra,* 53 Cal.4th at p. 76.)

20

"[A] trial court's inquiry into possible grounds for discharge of a deliberating juror should be as limited in scope as possible, to avoid intruding unnecessarily upon the sanctity of the jury's deliberations. The inquiry should focus upon the conduct of the jurors, rather than upon the content of the deliberations." (*People v. Cleveland* (2001) 25 Cal.4th 466, 485.)

In context, we do not agree with defendant that the trial court's question improperly suggested that the jurors could not use their personal experiences in any way during deliberations. As the Attorney General points out, the trial court asked the question immediately after discharging Juror No. 8 for improperly using his specialized professional experience *as evidence*. The trial court's question following removal of Juror No. 8 did not convey to the jury that it was not proper to *evaluate* evidence based on their personal experience. (See *Allen*, *supra*, 53 Cal.4th at p. 76.) The trial court had previously instructed the jury, pursuant to CALCRIM No. 105, that in deciding whether a witness's testimony is true and accurate, the jurors were to "use [their] common sense and experience," and that instruction was reiterated in CALCRIM No. 226, which was provided to the jury in written form. Nothing about the trial court's jury misconduct inquiry suggested that the jurors could no longer rely on their personal life experiences when considering the evidence.

In sum, we find no error in the trial court's inquiry into juror misconduct.

## IV.   DISPOSITION

The judgment is affirmed.

_____

BAMATTRE-MANOUKIAN, ACTING P.J.

WE CONCUR:

_____

MIHARA, J.

_____

GROVER, J.